THE STATE *ex rel.* LUZON B. MORRIS *vs.* MORGAN G. BULKELEY.

New Haven & Fairfield Cos., Oct., T., 1891. ANDREWS, C. J., CARPENTER, SEYMOUR, TORRANCE and FENN, Js.

The constitution of the state, as amended in 1875 and 1884, after providing for the election of governor by ballot at the electors' meetings in November in alternate years, proceeds as follows:—" When such ballots shall have been received and counted in the presence of the electors, duplicate lists of the persons voted for, and of the number of votes given for each, shall be made and certified by the presiding officer, one of which lists shall be deposited in the office of the town clerk within three days, and the other, within ten days after said election, shall be transmitted to the secretary, or to the sheriff of the county in which such election shall have been held. The sheriff receiving said votes shall deliver or cause them to be delivered to the secretary within fifteen days next after said election. The votes so returned shall be counted by the treasurer, secretary and comptroller within the month of November. A fair list of the persons and number of votes given for each, together with the returns of the presiding officers, shall be, by the treasurer, secretary and comptroller, made and laid before the General Assembly, then next to be holden, on the first day of the session thereof; and said Assembly shall, after examination of the same, declare the person whom they shall find to be legally chosen, and give him notice accordingly. If no person shall have a majority of the whole number of said votes, or if two or more shall have an equal and the greatest number of said votes, then said Assembly, on the second day of their session, by joint ballot of both houses, shall proceed with-

State ex rel. Morris v. Bulkeley.

out debate to choose a governor from a list of the names of the two persons having the greatest number of votes, or of the names of the persons having an equal and highest number of votes so returned as aforesaid. The General Assembly shall by law prescribe the manner in which all questions concerning the election of a governor, or lieutenant governor, shall be determined." The General Assembly in 1877 enacted the following statutes:—Gen. Statutes, § 239. "The presiding officers of each electors' meeting in every town not divided into voting districts, and each presiding officer of the first district in all towns divided into voting districts, * * * shall make out triplicate lists of the votes given in their respective towns for each of the following officers, namely, governor, * * * two of which lists he shall seal and deposit in the post-office in said town, the postage being paid thereon, directed to the secretary of the state at Hartford, one within two days, and the other within not less than five nor more than ten days after said meeting; and the third he shall deliver to the clerk of said town within two days after said meeting." § 240. "The presiding officer shall, with the certificate upon the result of the electors' meeting, which he is required to send by mail to the secretary of the state, send to the secretary his certificate of the whole number of names on the registry lists, the whole number checked as having voted at such election, the whole number of names not checked, the number of ballots found in each box, namely, 'general' and 'representative,' and the number of ballots in each box not counted as in the wrong box, and the number not counted for being double, and the number rejected for other causes, which other causes shall be stated specifically in the certificate. The secretary shall enter said returns in tabular form in books kept by him for that purpose, and present a printed report of the same to the General Assembly at its next session." By art. 4, § 1, of the constitution, modified by the 27th amendment, the governor, elected in November, was to hold office from the Wednesday following the first Monday of the next succeeding January until the Wednesday after the first Monday of the third succeeding January, and "until his successor was duly qualified." In an information in the nature of a writ of *quo warranto*, brought in October, 1891, the relator claimed to have been elected by a majority of the ballots cast at the election in November, 1890, and to have been legally declared elected, and to have been duly qualified. The defendant had been elected governor in November, 1888, and had held the office for the years 1889 and 1890, and had continued to hold over. He had not been a candidate at the election of November, 1890. The Senate had declared the relator elected and he had taken the oath of office. The House of Representatives had refused to concur in the declaration, claiming that the relator had not received a majority of the ballots. It had also passed a resolution that it would take no action in the matter of declaring the result of the election, until the Senate should have taken action in the matter of examining all the returns by a joint committee. Held.—

1. That the declaration of the result of an election of governor is an indis-

pensable adjunct to the choice by the electors, and furnishes the only authentic evidence of what the choice is.

2. That the constitution contemplates the making of the declaration in all cases by the General Assembly, and that the declaration when thus made shall be final and conclusive.

3. That the declaration is to be made by both houses of the Assembly, acting jointly or concurrently. A declaration by one house without the other could have no effect.

4. That there having been no legal election in this case, the defendant remained the *de jure* as well as the *de facto* governor of the state.

The constitution provides for no evidence of the election of a governor from the examination of which the General Assembly is to make the finding and declaration, except the "fair list" prepared by the treasurer, secretary and comptroller and the "returns" of the presiding officers. In the absence of all legislation and in all ordinary cases the intent of the constitution would seem to be that the General Assembly should declare that result which is shown by this list and these returns.

If there should hereafter be legislation providing that other evidence should be admitted, the intent would seem to be equally clear that the Assembly should also examine that evidence.

The wisdom of the General Assembly is left unfettered as to the laws by which it shall prescribe a manner for the determination of questions concerning the election of governor. It may require other and more complete returns and from other officers, or may create other tribunals to hear and report on such matters, but such returns or reports must be laid before the General Assembly on the first day of the session, to the end that it may itself make the final examination and declaration as required by the constitution.

Sections 239 and 240 of the General Statutes are such further provisions on the subject, and appear to be a compliance with the direction of the constitution in this behalf; and what the General Assembly was commanded by the constitution to prescribe, it would be its duty to examine.

The examination required should be sufficiently full to determine who is legally chosen governor, so that the person who is declared to be chosen shall have an unimpeachable title to the office.

The time and manner of examining must be determined by a consideration of the means provided or which may hereafter be provided for its performance, and with reference to that condition of things which will exist when the General Assembly shall, by suitable laws, have directed as to the mode of performance.

The constitution requires that the list and returns shall be laid before the General Assembly on the first day of its session, and that, if it shall find that there has been no choice of governor it shall proceed to make choice the.second day. This would seem to make it necessary that the examination of the list and returns should be made by at least the second day of the session. But whether the General Assembly has power to act in the matter after the second day: *Quære.* The precedents, and the general rule of a strict observance of constitutional requirements, are against the existence of such a power.

But as the Assembly had not adjourned and as it was legally possible for either house to recede from the position it had taken, the court was not prepared to hold that it had lost the power to act further in the matter of declaring the election of a governor.

Whether, in the entire collapse of the legislative department, it is not possible that the Superior Court may make an investigation, and, on finding that the relator received a majority of all the votes lawfully cast for governor, establish his title by some judgment that shall be legally equivalent to the declaration which should have been made by the General Assembly: *Quære.*

The Superior Court cannot make the declaration which the constitution says shall be made by the General Assembly. The utmost that it can do in such a case as this, is, by some judgment which it can lawfully make, to supply an omission or heal a defect.

It is a general and indisputable rule that where there is a legal right there is a legal remedy by suit whenever it is invaded.

The Superior Court is a court of general jurisdiction, and has jurisdiction of all matters cognizable by any law court, of which exclusive jurisdiction is not given to some other court.

To decide what person is lawfully elected to any office is a judicial process, and where there is no tribunal specially authorized to make such decision, the courts must decide. And the courts always have jurisdiction where the decision of the special tribunal is not final and conclusive; and where such special tribunal refuses, or from any cause fails to act, the court, upon general principles and to prevent a failure of justice, and perhaps to prevent anarchy and misrule, would seem to be authorized to make the decision.

The writ of *quo warranto* is the form of action specially adapted to try the right to an office. But it tries only the real title. It can never be used to try a merely apparent title.

The present information held insufficient in not alleging that the relator had a majority of all the votes, but only the majority as it appeared by the returns of the presiding officers, while other parts of the information showed that such apparent majority was in dispute.

Also insufficient in not alleging facts which showed that the General Assembly had become unable to decide upon the relator's right to the office.

And held that if the relator should, by an amendment of the information, or by a new one, allege that he received a majority of all the votes lawfully cast for governor, and should state such facts as showed that the General Assembly was without the power to make any declaration in respect to the election, a case would be presented of which the Superior Court might take jurisdiction.

The provision of the constitution that the governor should hold office until his successor is duly qualified, was designed to cover exigencies supposed to be brief.

The constitution is a limitation of the powers of the General Assembly in all cases covered by its provisions; leaving its powers unimpaired in other respects.

[Argued November 23d and 24th, 1891—decided January 5th, 1892.]

, INFORMATION in the nature of a writ of *quo warranto ;* brought to the Superior Court in New Haven County. The ·information was as follows :—

To the Honorable Superior Court for New Haven County, now in session in said New Haven; comes Tilton E. Doolittle, attorney for the state within and for the county of New Haven, who in this behalf prosecutes in his own proper per- ·son and in behalf of the state of Connecticut, at the relation of Luzon B. Morris, of the town and county of New Haven, ,and gives this court to understand and be informed :

That on Tuesday, the 4th day of November, 1890, being the Tuesday after the first Monday of November in that year, a general election for a governor of the state was held in the several towns of this state, as required by the consti- tution, and that said Luzon B. Morris was one of the persons voted for at said election for governor.

That lists of the persons voted for at the meetings of the electors in the respective towns of the state, so held for· such purpose, and of the number of votes received and counted at such meetings as given for each, were made and certified by the·presiding officers of said several electors' meetings re- spectively, and were by such presiding officers transmitted, together with the returns of said election, to the secretary of the state, as required by the constitution and by the laws, and as appears in detail by such lists and returns hereinafter set forth in detail.

That the votes so returned by the presiding officers of the said several electors' meetings to the secretary, as re- ·ceived and counted for the office of governor, were within the month of November, 1890, counted by the treasurer, sec- retary and comptroller of the state, by which count it ap- ·pears that the number of 67,662 of said votes, so as aforesaid returned as received and counted, had been given for said Luzon B. Morris, and the number of 67,636 of said votes, so as aforesaid returned as received and counted, had been re- ceived and counted for all other persons voted for for said office of governor. Said count in the said several electors' meetings of the votes counted, and said count of the votes

State ex rel. Morris *v.* Bulkeley.

so returned as counted by the presiding officers as aforesaid, made by the treasurer, secretary and comptroller of the state, was mathematically accurate, except that the presiding officers of the town of Milford made a second amended and corrected return for said town, which said amended and corrected return was not regarded by said treasurer, secretary and comptroller, in making the count aforesaid.

That the General Assembly of this state holden next after the counting of said votes by the treasurer, secretary and comptroller as aforesaid, met in stated session at Hartford, on Wednesday, the 7th day of January, 1891, being the Wednesday following the first Monday of January of that year.

That on the first day of said session of said General Assembly, namely, the 7th day of January, 1891, the said treasurer, secretary and comptroller, by whom the votes returned as aforesaid as received and counted for governor had been counted, as hereinbefore stated, laid before the General Assembly a fair list by them made of the persons returned as voted for for said office, and the number of votes returned as aforesaid as received and counted for each at the general election held as aforesaid, as such result appeared by such count of the votes by them made, together with the returns of the said presiding officers of the said several electors' meetings. Copies of such fair lists by them made of the persons returned as voted for for said office, and the number of votes returned as received and counted for each at said election, together with the returns of the presiding officers of the said electors' meetings, are hereto affixed, and are made part hereof as fully as if embodied herein.*

---

* The report of the canvassing board, appended to the complaint as an exhibit, was as follows:

To the Honorable General Assembly of the State of Connecticut, to be holden at Hartford, in said State, on the Wednesday after the first Monday of January, A. D. 1891:

The undersigned, being designated by law to canvass the votes for Governor given in by the electors at their meetings in the several towns of this state on the Tuesday after the first Monday of November, A. D. 1890, respectfully report:

State ex rel. Morris v. Bulkeley.

· And the said attorney avers that by the count made by the treasurer, secretary and comptroller of the votes returned as received and counted as aforesaid to the secretary as hereinbefore stated, and by the fair list made as aforesaid of the persons returned as voted for, and the number of votes received and counted as given for each, and by them laid before the General Assembly, it appeared that a majority of the whole number of votes returned by said presiding officers as received and counted in the presence of the electors at the electors' meetings in the several towns for governor, were given by the electors for Luzon B. Morris, and that therefrom it appeared that said Luzon B. Morris had been chosen by the electors of the state, at the general election aforesaid, to be the governor of the state from and after the 7th day of January, 1891; and the Senate, on said first day of the session of said General Assembly, and after examina-

That they entered on the duties assigned them on the 22d day of November instant, and publicly canvassed on said day and on subsequent days the votes for Governor given in as aforesaid and returned to the secretary of the state.

That the whole number of votes returned and counted for Governor is one hundred and thirty-five thousand two hundred and ninety-eight, of which number sixty-seven thousand six hundred and fifty-eight are for Luzon B. Morris, four are for L. B. Morris, sixty-three thousand nine hundred and seventy-five are for Samuel E. Merwin, one for S. E. Merwin, and the residue are for sundry persons whose names are specified in the statement accompanying this report, with the number of votes given for each.

The official returns show also that in certain voting districts a large number of ballots were cast which were not counted for the following reasons, namely: "Prohibition votes not printed in conformity with the law," "Not printed according to law," "the word 'For' was printed before the name of the office voted for," "Marked," "Illegal," and for other causes which are not specifically stated. No return of the names of the persons for whom these ballots were cast has been made.

It also appears from evidence presented to the canvassers that there is a clerical error in the return of the vote of the town of Milford.

The election returns are herewith submitted for inspection.

Dated at Hartford, November 26th, A. D. 1890.

R. JAY WALSH, Secretary.
E. STEVENS HENRY, Treasurer.
JNO. B. WRIGHT, Comptroller.

tion of said fair list of votes and persons voted for and said returns of said several presiding officers, did find and by resolution did declare as follows :—

" *Whereas*, the treasurer, secretary and comptroller have made a fair list of the persons voted for at the election held on the fourth day of November, 1890, and of the number of votes given for each person, and have laid before the General Assembly said list, together with the returns of the presiding officers of all the electors' meetings, of the votes for governor, lieutenant-governor, secretary, treasurer and comptroller, made and certified by said presiding officers at said election; and

" *Whereas*, after an examination of said lists and said returns it appears that Luzon B. Morris has a majority of the whole number of votes given for governor, and that Joseph W. Alsop has a majority of the whole number of said votes given for lieutenant-governor, and that Marvin H. Sanger has a majority of the whole number of said votes given for treasurer, and that John J. Phelan has a majority of the whole number of said votes given for secretary, and that Nicholas Staub has a majority of the whole number of said votes given for comptroller; and the constitution in such case directs the General Assembly, by imperative command, to declare the persons who have respectively received a majority of said votes to be legally chosen. Therefore—

" *Resolved* by the Senate that the General Assembly hereby declares Luzon B. Morris to be legally chosen governor. * * *

" The Senate transmitted said resolutions to the House of Representatives; and thereupon adjourned to January 8th, 1891, and from that day to January 13th, 1891, when the Senate passed the following resolutions :

" *Whereas*, the Senate, pursuant to the provisions of the constitution, has duly examined the returns made by the presiding officers of the several electors' meetings held on the 4th day of November, 1890, for the election of governor, lieutenant-governor, treasurer, secretary, and comptroller, and has also examined the fair list of votes relating thereto

submitted by the duly constituted authorities, and after such examination did find, and therefore did, on the first day of the session of the General Assembly, declare, that Luzon B. Morris has received a majority of the whole number of such votes given for governor, * * * and that said persons are respectively chosen to said offices; and

" *Whereas,* a select committee of the House of Representatives has been appointed in relation to said election, fair list of votes and returns made by said presiding officers; and

" *Whereas,* the Senate, upon full and deliberate consideration, has determined that the constitution does not invest the General Assembly with revisory jurisdiction over the judgment of the presiding and other officers of such electors' meetings, nor give to the General Assembly inquisitorial power in reference to the conduct of such electors' meetings by the regularly appointed and qualified officers; and

" *Whereas,* the Senate has declined to revise the judgment of the duly chosen and qualified officers of such electors' meetings in reference to said election; and

" *Whereas,* the resolution appointing said House select committee is so worded as to permit the inquiry by and opinion of said committee upon the question whether the ballots cast at said electors' meetings should have been counted as and declared to be votes, thus substituting the judgment of said committee and House of Representatives in place of the judgment of the duly chosen and qualified officers of said electors' meetings:—Now therefore—

" *Resolved* by the Senate:—

" *First.* That the 'ballots' cast at an election for state officers in the several electors' meetings do not become 'votes' until such ballots have been counted and declared in the presence of the electors, and returned as votes by the officers duly appointed to that duty.

" *Second.* That the General Assembly has no constitutional jurisdiction to revise the judgment of the officers duly appointed to conduct the several electors' meetings.

" *Third.* That neither the Senate nor the House of Representatives can by its authority substitute the judgment of

a committee for the judgment of the constitutional officials for the purpose of determining whether the 'ballots' cast should be counted, declared, and returned to be 'votes.'

"*Fourth.* That as the Senate has taken decisive action in reference to said fair list of votes and returns of said presiding officers, and has declared the result of said election as a finality based upon a construction of the constitution which prohibits the proposed investigation by the said House select committee, extrinsic of said fair list of votes and returns of presiding officers, therefore no such investigation and no such finding by said House select committee based upon such investigation can possibly alter the result of said election as declared by the Senate.

"*Fifth.* That said Luzon B. Morris, Joseph W. Alsop, Marvin H. Sanger, John J. Phelan and Nicholas Staub having been duly chosen on the 4th day of November, 1890, by the electors of the state to be governor, lieutenant-governor, treasurer, secretary, and comptroller, respectively, as fully appears from the fair list of votes submitted to the General Assembly by the duly constituted authorities, and the returns of the presiding officers of the several electors' meetings accompanying the same, no refusal by the House of Representatives to perform its constitutional duty to declare said fact, and no declaration contrary thereto based upon evidence extrinsic to said returns of said presiding officers of the several electors' meetings, can affect or impair the right of the persons so chosen to the several state offices to enter upon the duties, and to exercise the powers, of their respective offices, and that it is the duty of the persons severally chosen as aforesaid to enter upon the performance of their several official duties as soon as may be.

"*Sixth.* That Senators Twitchell, Butler and Clark be, and they hereby are, appointed a committee to wait upon the Hon. Luzon B. Morris, and notify him of his said election, and request him to attend before the Senate immediately, to take the oath provided by law for governor, and at once to enter upon the duties of said office. * * *"

And thereupon, afterwards and on said last mentioned

day, the said committee appointed as aforesaid to wait upon the governor, reported that they had performed their duty, and that they then presented the governor in person before the Senate; and thereupon the said Luzon B. Morris, in compliance with the resolution of the Senate, proceeded to take the oath provided by law for the office of governor, and qualified to proceed in the discharge of the duties thereof, and did then enter upon the discharge of his duties as governor. And thereupon the Senate, by legal adjournment from day to day, has been in session upon the following days: January 20, 21, 27, 28, 29, February 3, 4, 5, 10, 11, 12, 17, 18, 24, 25, 26, March 3, 4, 5, 11, 17, 18, 19, 24, 25, 26, 31, April 1, 7, and from said 7th day of April has been adjourned until the 14th day of April, 1891.

The House of Representatives convened on the Wednesday after the first Monday of January, 1891, being the 7th day of January, 1891, and on said day adopted the following rule: " Rule 44. It shall be the duty of the clerk to enter on each page of the journal, at the top thereof, the ordinal number indicating the legislative day of the session.   Whenever the House shall order that a recess be taken to some subsequent calendar day, such subsequent calendar day shall be treated as a part of the same legislative day, and the clerk shall make the proper journal entries and indorsements on legislative files to conform to this rule."

And on said 7th day of January, 1891, the report of the board of canvassers, being the said fair list of votes and persons voted for and the said returns of the said presiding officers, hereinbefore referred to, was received by said House of Representatives and transmitted to the Senate, and afterwards said House of Representatives voted to " take a recess until 10 o'clock A. M. on Thursday next," that being the 8th day of January, 1891.   Said House of Representatives was thereupon in session on said 8th day of January, 1891, and had before that body said fair list of votes and persons voted for and returns of said presiding officers duly received from the Senate, together with the action of the Senate there-

on hereinbefore set forth ; and thereupon the said House of Representatives passed the following resolution :

" *Whereas*, this House, in accordance with a custom and practice which has been unbroken for more than fifty years, passed a resolution providing for the appointment of a joint committee to examine the returns and canvass the votes given by the electors for state officers, and referred to such committee the returns of the presiding officers of the electors' meetings held on the fourth day of November, 1890, and transmitted such resolution and the returns so referred to the Senate ; and

" *Whereas*, that branch of the General Assembly has refused to concur with this House in such action, but has referred said returns to a special committee of the Senate ; and

" *Whereas*, the Senate has refused to examine the said returns to determine whether the same are true, legal and regular, or contain a correct statement of the votes legally cast by the electors on the fourth day of November, 1890, or to hear any evidence relating to the same ; and

" *Whereas*, the Senate has returned the said original returns of the electors' meetings to this House, without having made the examination required by the constitution, together with sundry joint resolutions relating to the same subject matter :—

" Now, therefore, in order that the constitutional duty imposed upon the General Assembly may be duly performed, and to the end that every ballot legally cast at the election held on the fourth day of November, 1890, may be duly counted, and that no person shall be declared elected to any office to which he was not legally chosen :—

" *Resolved* by this House ; that the report of the state canvassers, together with the returns of the presiding officers of the electors' meetings, and the resolutions received from the Senate relating to the election of state officers, and declaring sundry persons to be duly elected, be referred to a House select committee of eight members, to be appointed forthwith by the speaker.

" *Resolved*, that said committee be, and it is hereby au-

thorized, to make examination of the returns of the presiding officers of the electors' meeting held on the fourth day of November, 1890, for the purpose of making the examination thereof required by the constitution. And for the purpose of making such examination said committee is hereby authorized to take evidence extrinsic of said returns and explanatory thereof, if they deem necessary; and for the purpose of such inquiry said committee is further authorized to sit during any recess in the sessions of this House, and to send for persons and papers.

"*Resolved*, That all resolutions, bills, petitions, and other papers and documents hereafter introduced in this House, and relating to the election of state officers, be referred without debate to the select committee herein provided for."

And on said day the committee provided for in said resolution was appointed, and afterwards the House voted a recess until Tuesday, January 20th, 1891, at ten o'clock A. M.; and said House was again in session on said January 20th, 1891, at ten o'clock A. M., and on said day proceeded to vote for a senator in the Congress of the United States, and then said House voted a recess until eleven o'clock A. M., Wednesday, January 21st, 1891, when said House was again in session, and on that day suspended its session while the joint assembly of the members of the Senate and House of Representatives convened for the election of a senator in the Congress of the United States; and after said joint assembly had dissolved, said House of Representatives voted a recess until Tuesday, January 27th, 1891, at one o'clock P. M.; and on said January 27th, said House was again in session, and voted a recess to January 28th, 1891; when said House of Representatives again convened in session, at which time the House select committee, to whom had been referred the report of the state board of canvassers, made the following report:

"The House committee on the canvass of votes for state officers respectfully beg leave to report that they have had before them the lists of persons voted for for state officers, and number of votes given for each, together with the returns of the presiding officers, and the other documents

which were referred to them by the House of Representatives, in accordance with the provisions of the constitution.

"That the first object of their investigation has been to find whether upon the face of the returns any person was legally chosen to either of the state offices. That they have examined said lists and returns, and find the following facts :

"It appears from the face of the returns that there were in the whole state 1289 general ballots rejected ; 458 for being 'double,' which, since the passage of the so-called secret ballot law, is no longer, in the opinion of the committee, legal cause for rejection ; and 831 for all other causes. Of said 831, 111 general ballots were rejected for the following causes, none of which assignments of cause, in the opinion of the committee, justifies the rejection of a ballot, to wit : *Illegal*, New Britain, 15 ; *Illegal*, Killingworth, 4 ; *For having on the word 'For,'* Brooklyn, 7 ; *Because of word 'For,'* Waterbury, 43 ; *Prohibition votes not printed in conformity with the law*, Norwalk, 30 ; *Not printed according to law*, Stratford, 11 ; *Not as prescribed by law*, Wolcott, 1 ; Total, 111.

"To call a ballot 'illegal' is not to give a cause for rejecting it. The law requires a specific statement of what the illegality consists in. It also appears that eleven general ballots were rejected with the following statements, in lieu of any assignment of cause whatever, to wit : *Not known*, Meriden, 4 ; *Not counted*, Lebanon, 3 ; *Not stated*, Haddam, 4 ; Total, 11. It further appears that 110 general ballots were rejected and no cause assigned.

"Your committee further find from the face of said returns that in many towns throughout the state the number of votes for state officers counted and returned by the counters and moderators exceeds the number of votes cast in said towns respectively, as will appear from schedules attached to this report.

"In considering the returns your committee have recognized the principle that in finding whether a candidate has a majority of a certain number of ballots, where the investiga-

tion is limited to a certain vote and that vote fails to show a majority, there is no ascertainable majority.

"Therefore from the face of the returns the committee are unable to determine that any person was legally chosen to either of the following offices at the last election, to wit: the offices of governor, lieutenant-governor, treasurer, and secretary, as it appears from the face of said returns that more than a decisive number of votes were illegally rejected, or rejected without specifying legal causes of rejection ; but the face of the returns indicates the election of Nicholas Staub to the office of comptroller.

"When your committee, in pursuance of their duties, proposed to examine evidence explanatory of said returns, which was called for by questions arising on the face of the returns, the Democratic minority refused to sit with the committee, on the ground that neither the committee nor the General Assembly had power to take any extrinsic evidence regarding the returns.

"At the same sitting counsel representing Democratic interests appeared before the committee, and stated that if the ballot-boxes were to be opened he could and would tender to the committee for its use the fact that about 2500 Prohibition, Labor and Republican ballots were illegally cast, counted and returned, and he requested that if any boxes were to be opened he should have an opportunity to be present and examine the ballots; which request was granted. Counsel representing Republican interests afterwards appeared before the committee and stated that if the ballot-boxes were to be opened he could and would tender to the committee for its use the fact that several thousand Democratic and Prohibition ballots were illegally counted and returned.

"Your committee, in pursuance of their duties, examined the evidence explanatory of said returns, and find that in the fourth district of the town of Norwich thirty-eight general ballots were returned as counted in excess of the number of general ballots cast in that district, and in excess of the number of names checked as voting in said district.

" Your committee further find that twenty of said wrongfully returned general ballots were counted for the Democratic candidates for governor, lieutenant-governor, treasurer and secretary, and ten of them for the Democratic candidate for comptroller, by reason of a clerical error in footing the number of votes counted for them respectively. Your committee have been unable to find for whom the remaining eighteen votes were counted, or the cause of their being counted.

" Your committee further find that 126 Republican general ballots were rejected in the fifth district of Bridgeport for having an alleged distinguishing mark, and that said distinguishing mark was merely a minute speck made by defective printing, was also found on numerous ballots used in other places at said election, and was not a distinguishing mark in the meaning of the law.

" Your committee further finds that 103 general ballots, which are part of the class of 111 hereinbefore referred to as rejected, were rejected solely because the word 'For' was printed thereon as part of the title of each officer voted for, and that therefore the said ballots were illegally rejected.

" We therefore report upon the evidence taken by us :—

" 1. That no person has a majority of the whole number of votes lawfully cast for governor ; and that the names of the two persons having the greatest number of votes for governor are Samuel E. Merwin and Luzon B. Morris.* * *

" Your committee found referred to it a resolution, introduced by Mr. Hotchkiss of New Haven, concerning the investigation to be made by them, the broad and sweeping provisions of which would require the opening of many and perhaps all the ballot-boxes in the state, and the examination of many and perhaps all of the general ballots in said boxes. Your committee have no doubt that it is within the proper functions of a joint committee of both branches of the General Assembly to institute and carry on such an investigation, acting under instructions contained in a joint resolution. But, in the opinion of your committee, it would be a waste of time to pursue the investigation to the extent required by

the resolution of the gentleman from New Haven, unless it is understood before the investigation is begun that the other branch of the General Assembly is willing to investigate all questions relating to the election in as thorough a manner as the resolution requires.

" Your committee are confident in the correctness of the conclusions at which they have arrived as the result of their investigation ; but, in view of the aforesaid resolution introduced by Mr. Hotchkiss, the Democratic member from New Haven, calling for a thorough investigation of ballot-boxes, and in view of the aforesaid claim made by counsel that great numbers of ballots have been illegally counted, your committee is of the opinion that the House ought not to ·refuse to enter into any investigation of the election to the most thorough extent which may be desired by the Senate; and that, until the Senate have expressed their decision with regard to the question of such an investigation, no declaration of the result of the election should be made by this House.

" We therefore recommend the passage of the accompanying resolution :—

"*Resolved* by this House :— Sec. 1. That the facts reported by the House select committee on canvass of votes are found to be true.

" Sec. 2. That a copy of the report of the committee and of this resolution shall be immediately transmitted to the Senate.

" Sec. 3. That if the Senate shall decide to investigate the said election to the extent called for by said Hotchkiss resolution, this House will join in said investigation to the furthest extent to which the Senate will consent.

" Sec. 4. That the House will take no action declaratory of the result of the late election for state officers till the Senate shall have taken action in the matter of an examination of all the returns of presiding officers, including those made under § 240 of the Revised Statutes of 1888, by a joint select committee on canvass of votes."

And thereupon the said House of Representatives voted to take a recess until January 29th, 1891; and on said 29th

day of January, 1891, said House was again in session, and voted a recess until January 30th, 1891, and on said January 30th, 1891, was again in session, and passed a resolution authorizing the committee on canvass of votes to return to the custody of the House the returns of the presiding officers which were actually before the House, and were referred to the committee, and that the committee be discharged from further custody of the returns; and thereupon said House voted a recess until February 3d, 1891. The said report was, on said 3d day of February, 1891, accepted and adopted by the House of Representatives, and the accompanying resolutions passed. And from February 3d a further recess was voted until February 4th, and then a further recess until February 5th, and then a further recess until February 10th, then to February 11th, then to February 12th; and on said February 12th, being in session, by the House joint resolution No. 47, Nicholas Staub was declared elected comptroller; and then said House voted a recess to February 18th, and then, being in session, adopted the following resolution:

" Resolved by this House:

" That the following be, and they hereby are, adopted as rules of this House.

"Rule 47. In the absence of a quorum the speaker may, at his option, pronounce a recess until the afternoon, or to the next sitting day, or to a calendar day within one week.

" Rule 48. The provisions of the resolution adopted by this House on the 8th day of January, providing that all resolutions, bills, petitions, and other papers and documents hereafter introduced in this House, and relating to the election of state officers, be referred without debate to the Select committee upon the canvass of votes for state officers."

And then said House took a recess to February 24th, and from then to February 25th, then again to February 26th, and being in session on said day, passed the following resolution:

" Resolved by this House:

" That the following be, and it hereby is, adopted as a rule of this House:

State ex rel. Morris *v.* Bulkeley.

" Rule 51. No motion, resolution, bill, petition, or other document relating to the election of state officers shall be acted on by this House until the second calendar sitting day after the day on which the same shall have been moved, introduced or reported to the House."

And then voted a recess to March 3d, * * * and the House was again in session on March 17th, 1891, when the House of Representatives acted upon the report of the House committee on the canvass of votes for state officers, on resolutions declaring Luzon B. Morris elected governor, Joseph W. Alsop, lieutenant-governor, John J. Phelan, secretary, and Marvin H. Sanger, treasurer, recommending the rejection of the resolutions; * * * and the resolutions were rejected and the report of the committee accepted; and from thence said House has voted to adjourn until November 11th, 1891. None of the acts hereinbefore recited have been rescinded or repealed, and said General Assembly has not yet adjourned without day.

Morgan G. Bulkeley, the defendant, was one of the persons voted for for governor at the general election held in November, 1888, but did not receive a majority of the whole number of votes given for governor ; and a committee of the General Assembly held on the Wednesday after the first Monday of January, 1889, on the first day of the session of said General Assembly, did find and report to the said General Assembly as follows : * * *

And thereupon, afterwards, and on the said 10th day of January, 1889, the said joint convention was held, and the said convention did proceed to choose by ballot a person to fill the office of governor of the state of Connecticut from a list of two persons found to have the greatest number of votes for the office of governor at the electors' meetings held on the Tuesday after the first Monday in November, 1888, with the result that Morgan G. Bulkeley by said convention was duly chosen to such office ; and thereupon said Bulkeley duly qualified and proceeded to discharge the duties of his said office.

Said Morgan G. Bulkeley was not a candidate for gover-

nor at the general election held in November, 1890, and does not claim to have been elected at said election.

And now said attorney says that by reason of the facts hereinbefore stated in detail, Luzon B. Morris was, at the general election held on the 4th day of November, 1890, chosen by the electors to be the governor of the state, and upon and since said first day of the session of the said General Assembly held in January, 1891, said Luzon B. Morris has been, upon taking the oath provided by law, entitled to said office, and to all the rights, privileges, dignities and emoluments appertaining thereto.

And said attorney further gives this court to understand and be informed:

That said Morgan G. Bulkeley claims the right to act as governor, and said claimed right is not admitted by the Senate, but is denied by said body, and he is not recognized by said Senate as the lawful governor of this state, and said Senate refuses to acknowledge his claim to act as governor. And said claimed right of Morgan G. Bulkeley to act as governor is admitted by the House of Representatives, and he is recognized by said House of Representatives as the lawful governor of this state.

And said attorney further avers that said Morgan G. Bulkeley continues to use and exercise, and to the time of exhibiting this information has used and exercised, and still does use and exercise, the said office of governor, and continues to have, use and enjoy all the liberties, dignities, privileges and franchises to said office belonging and appertaining; all of which acts on the part of Morgan G. Bulkeley, the said attorney, upon the facts hereinbefore alleged, avers to be wrongful and without law or right.

And the said attorney further gives this court to understand and be informed:

That said Morgan G. Bulkeley has used, continues to use, and threatens and intends to continue to so use said office, its privileges, dignities, liberties and franchises belonging and appertaining thereto, which said use the said attorney avers, upon the facts herein alleged, to be an usurpation and

without law or right, and that said usurpation by said Morgan G. Bulkeley seriously menaces the peace, good order and welfare of the state and all the citizens thereof.

Whereupon the said attorney prays the consideration of this court here in the premises, that due process may be awarded against him, the said Morgan G. Bulkeley, to compel him to answer hereto, and to show to this court by what warrant or authority he claims to have used and enjoyed the office, liberties, dignities, privileges and franchises aforesaid. Dated at New Haven, this 13th day of October, 1891.

TILTON E. DOOLITTLE,

Attorney for the State for New Haven County.

The defendant demurred to the information, on the following grounds :

1. That the same, and the facts therein alleged, are insufficient in the law to entitle the plaintiff to the relief and judgment asked for. ·

2. The supreme executive power of the state is vested by the constitution in the governor, as a member of one of the co-ordinate branches of the government, and this court will take judicial notice and recognition of the person entitled to that office without inquiry, and has no power or authority under the constitution to make the inquiry or render the judgment asked for.

3. It was and is the constitutional right and duty of the General Assembly to examine, find and declare what person, if any, was legally chosen governor at the general election held in November, 1890, as alleged in the information, and give him notice accordingly ; and if no person was legally chosen at said election, then it was and is the constitutional duty of the General Assembly by joint ballot of both houses to choose a governor, and this court has no power or authority under the constitution to perform those duties for the General Assembly.

4. That it appears from the information that on January 10th, 1889, this defendant was duly and legally chosen governor of the state of Connecticut, and thereupon duly qualified and proceeded to discharge the duties of said office, and

ever since has continued in and now continues in said office, and that no successor to him has been duly chosen and qualified to fill said office; wherefore he says that his continuance in office is not a usurpation, but is in performance of his constitutional duties and the obligations of his oath, which require him to continue in office and take care that the laws be faithfully executed until his successor shall be duly and legally chosen and qualified.

5. That it appears from the information and from all the facts therein set forth in detail, that at the general election for governor of the state, held on November 4th, 1890, as therein alleged, no person had a majority of the whole number of votes lawfully cast for governor, and that the General Assembly has not found nor declared that any person was at said election duly and legally chosen to said office, and has not since that time, by joint ballot of the two houses or otherwise, chosen any person to fill said office; wherefore the defendant says that it appears that no successor to him in said office has been duly chosen and qualified.

The case was reserved upon the demurrer for the advice of this court.

*H. C. Robinson, W. C. Case* and *C. J. Cole*, in support of the demurrer.

The main propositions upon which the case for the defendant stands are the following:—(1) The information in the nature of *quo warranto* does not lie to test the title to the office of governor. (2) The jurisdiction of the General Assembly is full, final, complete and exclusive.

*First.* These proceedings cannot be maintained. This information, in the nature of *quo warranto*, was brought to the Superior Court for New Haven County to test the title of Governor Bulkeley. This is not a case of contested election between rival candidates asserting and defending their respective claims to the office, nor is it a case in which "all questions concerning the election of governor can be determined," within the meaning of the last clause of art. 4 of the constitution.

If the Superior Court for New Haven County can call the governor before itself to defend his title, then the only question thereafter to be considered, is the question of the right of Governor Bulkeley to exercise the office and maintain the title of governor.

The questions here pending are not before this court as a court of original jurisdiction, but as an appellate court having power to advise or review the court below upon the questions of law only. The court below must find and pass upon all questions of fact conclusively, and over the decision of that court upon the questions of fact this court has no power of review. That consideration is one of the most important and conclusive reasons against the power of the court below to summon the governor of the state before it for trial or inquest as to the title to his office.

The immediate question now is,—can the Superior Court within and for the County of New Haven, upon the information of the state's attorney for that county, require the governor of the state to appear before it and defend his title, and, if it shall find the fact against him, depose him from office? This question cannot be avoided by the claim that the information runs against the man and not against the office. If that court can try the title of a mere usurper, it can try the title of a *de jure* and *de facto* governor upon an allegation that he is a usurper. "If the court can judge, it may misjudge." *State ex rel. Brooks* v. *Baxter*, 28 Ark., 129. So that in the last analysis the claim against us here is that a judge of the Superior Court has power to depose a governor if he shall find the fact against him, whether in so finding he "judge or misjudge" the fact.

It is for this court to say whether the constitution and the laws intended to place such vast power in the hands of a single judge upon the information of a local prosecuting officer—to subject the governor to the possibility of being led out by a constable at the summons of a judge of the Superior Court to defend his title "in any corner of the state." *State* v. *Marlow*, 15 Ohio St., 135. Whenever inquiry into the title to the office of governor has been made

in other states by *quo warranto* it has been made under their constitution and laws by the attorney-general of the state, proceeding originally in the highest court of the state, with the single exception of the case of *State* v. *Baxter*, 28 Ark., 129, which case was finally overthrown by the case of *Baxter* v. *Brooks*, 29 Ark., 173.

The nature of the information considered historically, excludes the idea that it can be made use of to try the title of the supreme executive officers of the state. The information by writ of *quo warranto* was established and regulated in England by statute 9 Anne, ch. 20. For some of the limitations upon the use of the ancient writ, before this statute, see 3 Black. Com., 262, clause 5, and especially the note by Chitty, and cases there cited, showing that the information did not issue to try title to offices of all kinds. The statute of Anne permitted an information to be brought by leave of court, at the relation of any person desiring to prosecute the same against any person usurping, intruding into, or unlawfully holding, *any franchise or office in any city, borough or town corporate*, and the limitations expressly made in this statute are the same in substance as those which existed in practice under the ancient writ. ♦It thus appears that both the common law before the statute and the statute of Anne itself limited the operation of the writ and information to certain inferior offices. It was never claimed that the information could be made use of to set up or pull down a government or chief magistrate of a state. The theory of the process then was that it issued from a superior power or authority to an inferior one, and not otherwise. That was the course of the common law. "All jurisdiction implies superiority of power." 1 Black. Com., 242; *Mauran* v. *Smith*, 8 R. Isl., 192. In this state, before the adoption of the statute relating to *quo warranto*, the information was made use of. *State* v. *Tudor*, 5 Day, 329. The statute of Anne formed a part of the common law of this state. *Baldwin* v. *Walker*, 21 Conn., 181. From these illustrations it is manifest that at common law *quo warranto* would not lie to try the title to the office of governor.

There was no enlargement of the common law by our own statute of *quo warranto* which will permit the Superior Court to inquire into the title of the governor by means of that process.   This statute (Gen. Stat., sec. 1300,) is no more than a re-enactment of the common law, and the following limitations contained therein exclude the idea that the information could run against the governor:—(1.) It runs according to the course of the common law.   Hence it runs not against superiors in office.—(2.) The idea of the statute is, that the usurpation is local, as it would be if limited to a subordinate office.   Hence, the writ is issued upon information of the state's attorney for the county to punish for the usurpation, and is issued by the Superior Court "in the county where the cause of action arises."   Thus it is evident that the intention was to reach local offices only.—(3.) Jurisdiction over *quo warranto* is given to the Superior Court, presided over by a single judge.   It is preposterous to claim that the constitution and laws intended to subject the governor of the state to such a proceeding, especially in view of the formalities provided by the constitution for examining and declaring his title, and the high and composite tribunal provided for his impeachment.

Our position upon this point is strengthened by the numerous decisions of the highest courts of many of the states, that mandamus does not lie to compel the governor to perform his duties.   *Atty.-Gen.* v. *Barstow*, 4 Wis., 567 ; *Thayer* v. *Boyd*, a case from Nebraska just decided by the Supreme Court of the U. States, and not yet reported; *Ex parte Smith*, 8 So. Car., 495 ; *Royce* v. *Goodwin*, 22 Mich., 496 ; *State* v. *Marlow*, 15 Ohio St., 114 ; *State* v. *Harmon*, 31 id., 250 ; *Collin* v. *Knoblock*, 25 Louis. An., 263 ; *Rogers* v. *Johns*, 42 *Texas*, 339 ; *Batman* v. *Megowan*, 1 Metc. (Ky.,) 533 ; *State* v. *Mason*, 77 Mo., 189 ; *State* v. *Baxter*, 28 Ark., 129 ; *Baxter* v. *Brooks*, 29 id., 173 ; *Goff* v. *Wilson*, 32 W. Va., 393 ; *Carr* v. *Wilson*, id., 419 ; *Robertson* v. *The State*, 109 Ind., 79.

*Second.* No man can be the governor of Connecticut until he has been duly declared governor by the General Assem-

bly, and whoever is so declared holds the office until his successor be duly qualified. The defendant was duly declared governor by the General Assembly at its January session, 1889, and thereupon was duly qualified and entered upon the discharge of the duties of the office. A general election for governor was next held on the Tuesday after the first Monday of November, 1890, as the constitution requires, but no person has since been declared governor by the General Assembly, and therefore the defendant still rightfully holds the office. The General Assembly, upon which the duty of examining and the power of declaring the result of the general election for governor held in November, 1890, devolved, is still in session, and still clothed with the power of declaring who, if any person, was legally chosen governor. One branch of the General Assembly— the House of Representatives—has performed its constitutional duty of examination, and upon that examination has declared, and still does declare, that no person was legally chosen governor at that election. These propositions state the case for the defendant, and suggest the comprehensive question of this controversy, to wit:—What is the power of the General Assembly over questions concerning the election of governor? We submit that the jurisdiction of the General Assembly is full, final, complete, and exclusive, and that no judicial process will lie to test or determine a title to the governorship of Connecticut.

1. Let us look at the matter historically. The framers of the constitution considered the supreme executive power to be a co-ordinate department of the government, and the office so important and of such consequence to all the people, that as to the title there should never be any question or possibility of question or doubt. Hence they provided one, and only one, method of ascertaining and determining that title,—the declaration and notice made and given by the General Assembly, the legislative department of the government, to the end that all the people and all public officers throughout the state should at all times know who was governor.

The importance of absolute certainty at all times as to the supreme executive is discussed by Blackstone, 1 Com., 190. It is as important to the "public tranquility and to the consciences of private men that this rule should be clear and indisputable" in Connecticut, as it is in England.

The governor's assent to the laws enacted by the General Assembly is required. He is commander-in-chief of the militia. All commissions issue from him. It is his duty to take care that the laws be faithfully executed. His are the highest and most important of the executive functions, and upon him the welfare, peace, and good order of the state depend. The framers of the constitution placed upon him those high duties, and thus it must have been clear to them that, whatever doubt there might be as to the title to other offices, there must be no doubt as to the title of governor. They therefore embodied in the constitution itself that certain and absolute muniment of title, to be known by all men and disputed by none, the finding, declaration, and notice by the General Assembly. Const., art. 4, sec. 2. That declaration is followed by the oath of office taken in public, and by long-established custom by the public inauguration, and thus the people know and are not in doubt as to the office. To cover all possible contingencies the constitution proceeds one step further, and provides that the governor shall hold his office for a fixed term, and until his successor be duly qualified. Const., art. 4, sec. 1 ; 27th amendment to Const., sec. 2. Under that provision it was, and is, the duty of Governor Bulkeley to continue in office. The article of the constitution which requires the General Assembly to find and declare what person has been chosen governor, upon a careful analysis, and in the light of historical knowledge of the manner of choosing a governor from the early days of the Colony, shows conclusively that the finding and declaration of the General Assembly were intended to be absolutely final and beyond dispute, and that the person who should hold that title must remain in possession of the office until some other person with a later title of the same indisputa-

ble character should appear to claim the office, that is to say, until his successor be duly qualified.

Under the charter the freemen were privileged to elect or choose one of their own number for governor " in the said General Court and Assembly to be held from that day or time, newly chosen for the year ensuing, by such greater part of the said company for the time being then and there present." See Charter in Rev. Statutes, 1808, p. 3. With the increase in the numbers of people and extent of settled country, all the freemen could not actually assemble in the General Court to elect officers ; hence the adoption of a pre-amble and public act in May, 1670, reciting the great diffi-culty and expense which the freemen of the Colony had in their personal attendance at the election at Hartford, and ordering that they should or might on the second Thursday in May, yearly, either in person or by proxy, at Hartford " attend *and consummate* the election of governour ; " and further ordering " that the election by proxies may be so managed that there be no fraud or deceit used therein," and that " all the freemen in the respective towns shall be warned by the constable, or one deputed by him, to meet where he shall appoint upon the last Tuesday in March or April an-nually, where they shall read to them the freeman's oath and a law which puts a penalty upon disorderly voting, and the names of those appointed to stand for nomination, out of which number the freemen may bring in to the said consta-ble the name of him whom they would have for governour for the year ensuing, fairly written upon a piece of paper, which the said constable shall receive, and, in the presence of the freemen, put them up in a piece of paper and seal them up, and write upon the outside of the paper the name of the town and these words, ' The Votes for the Governour.' In like manner they shall bring in their votes for the deputy governour," etc. ; and " the constable that receives the votes, and seals them up as aforesaid, shall by himself or one of the deputies of the court, convey the said proxies to Hartford, and deliver them at the election," and " at the time of election, those that stand for nomination shall be

put to election in the same order they are propounded," etc. \* \* \* "And the constables of each town shall take an account of the names of all those that shall vote in their several plantations, and send them with their proxies." General Laws, 1673, p. 22. That law in substance remained in force until 1803, and all the votes or proxies cast in freemen's meeting were sent up to the General Court, where, in theory, the election was held, there to be counted and declared in order that the election might be consummated. The names of the freemen casting the votes were also sent up. The election was not consummated until all those votes had been counted in the General Court and the result declared.

In 1803 that law was in part repealed, and a new act was passed, (Rev. of 1808, p. 253,) by which, instead of sending up the votes or proxies themselves, they sent up an abstract of them to the General Court, intending to place before it exactly the same information which the votes would have conveyed, saving to the General Court, however, the time and trouble of counting, and nothing more. Still in theory the election was consummated only when the General Court had acted upon the votes which had been given in freemen's meeting. In 1808, (Rev. of 1808, p. 256,) the provisions for counting and returning votes were still further enlarged and provision also made to supply omitted returns and correct defective returns. Article 4, sec. 2, of the constitution, in the first and second paragraphs, substantially follows the statutes of 1670 and 1803. And so on throughout sec. 2, article 4, of the constitution, which was intended to embody the laws then existing, and preserve to the General Assembly all the powers which the General Court had previously exercised in relation to the election and choice of governor. And the power which the General Assembly had embodied in the act of 1808, for the purpose of supplying omitted returns and correcting defective returns, was intended to be retained and preserved by means of the last clause of that section, viz.:—"The General Assembly shall by law prescribe the manner in which

all questions concerning the election of a governour or lieutenant governour shall be determined." The votes cast by the electors in the electors' meetings were returned to the General Assembly as "votes," and the intent still was that the General Assembly should have before it all the information which it would have if the votes themselves were sent up. And the intent of the constitution was that the election should not be consummated until the General Assembly had examined the synopsis and returns of *all the votes* cast in the electors' meetings, and from such examination, carried to their source, had found and declared the result.

2. Having thus far considered, historically, the relations of the General Court and the General Assembly to the election of state officers, we now proceed to inquire what is the power of the General Assembly in regard to the election of governor. It is the fundamental principle of a republican form of government that every qualified elector shall have the right and power to cast his ballot for whom he pleases, within such necessary limitations as the law establishes. It is the right of every such elector, and the right of him for whom he casts his ballot, that such ballot shall be received and counted as cast. It is indispensable for the protection and preservation of the privilege of free suffrage that for all denial of its lawful exercise, and for all fraud and mistake which defeat its purpose and result, there shall somewhere be a remedial power ample and absolute. It is certain that in the beginning this power was in the legislature, for the legislature was practically supreme from the charter of Charles to the constitution of 1818. See 1 Swift's System, 72; also sec. 4, chap. 10, of the Rev. of 1808, p. 256. How did the adoption of the constitution affect this power?

"The constitution of the *United States* is a *grant* of powers where they did not before exist; the constitution of this state is a limitation of powers already existing." *Pratt* v. *Allen*, 13 Conn., 125; *Starr* v. *Pease*, 8 Conn., 547. "As the constitution is a mere limitation on the powers of the legislative department, nothing should be regarded as pro-

hibited which is not so either expressly or by fair and reasonable implication." *Lowrey* v. *Gridley*, 30 Conn., 458.

It will hardly be contended that the constitution anywhere expressly forbids the legislature to fully examine the proceedings at general elections and declare the results in accordance with such examination. Does it so by fair and reasonable implication? For answer we must go to the constitution itself. See art. 6, sec. 6; art. 4, sec. 2; and the closing sentence of art. 3, sec. 6. The constitution nowhere confers upon, or prohibits to, any body, tribunal, class of men, or man, any power over the results of general elections except what is conferred or prohibited in these extracts from that instrument, and the inquiry now is, is there anything therein contained which, by fair and reasonable implication, prohibits the General Assembly from fully examining the results of a general election for governor, and declaring the result in accordance with its finding upon such examination? If there is no implied prohibition so clear and broad as to prevent legislative correction of *any*—the most glaring and notorious—fraud or mistake, then, we submit, the question is ended, for the occasion for legislative interference is a matter of legislative discretion and judgment. Article 4, section 2, imposes on the General Assembly the duty of consummating and declaring the election of governor, but there are several steps which the constitution presupposes have been duly and legally taken before the General Assembly commences its work, and certainly before it can make any declaration.—1. That the ballots of the electors have been received and counted in the presence of the electors. What is to be done if all have not been counted?—2. When the ballots have been received and counted, "duplicate lists of the persons voted for, and the number of votes given for each, shall be made and certified by the presiding officer." What is to be done if he does not make and certify such lists?—3. These lists shall be made and certified by the *presiding officer*. What is to be done if he was *not* the presiding officer, but a mere usurper? Shall his own certificate to his own official character be conclusive?—4. One of the

lists shall be deposited in the office of the town clerk within three days, and the other within ten days after the election shall be transmitted to the secretary of the state or to the sheriff of the county in which such election shall have been held. What is to be done if such.list from one or more towns is not transmitted to the secretary or to the sheriff? —5. The sheriff receiving the votes shall deliver or cause them to be delivered to the secretary within fifteen days next after the election. What is to be done if the sheriff who receives them does not deliver them and the secretary does not receive them?—6. The votes so returned shall be counted by the treasurer, secretary and comptroller within the month, etc. What is to be done if they are not so counted? —7. A fair list of the persons and number of votes given for each, together with the returns of the presiding officers, shall be by the treasurer, secretary and comptroller made and laid before the General Assembly then next to be holden, on the first day of the session thereof. If such list should *not* be made and *not* laid before the General Assembly, is it powerless to remedy the omission?

These steps taken, the constitution proceeds :—" Said General Assembly shall, after *examination* of the same, *declare* the person whom they *find* to be *legally chosen*." The purpose of the examination—to find out who ,is *legally* chosen—indicates unmistakably its character and practically its scope. The language is *not* " declare the person who shall appear to have a majority of the votes so returned." *That* would be appropriate language if the examination were to be a mere inspection of the papers. " After examination of the same." Is there here a fair and reasonable implication that this examination may not trace these returns to their source for the purpose of determining every question of their authenticity, reliability and *legality?* The constitution requires a finding as to whether there is a *legal* choice ; it provides with great plainness the *legal* prerequisites of that finding. Can it be claimed that in this language there is a fair and reasonable implication that the General Assembly may *not* determine whether the *legal* prerequisites have

been performed ?   If the General Assembly cannot deter-
mine, who can ?   If nobody can, what reasonable assurance
is there that the result of such a " finding " will be the dis-
covery of a *legal* choice ?   But on this question of implied
prohibition the entire article must be considered, and the
concluding sentence is : " *The General Assembly shall by law
prescribe the manner in which all questions concerning the elec-
tion of governour or lieutenant-governour shall be determined.*"
And this prescription by law manifestly may be made either
before or after the questions have arisen ; may be by general
or special law, as the General Assembly sees fit.   *Selleck* v.
*South Norwalk*, 40 Conn., 359.   This is not restrictive or
prohibitory.   On the contrary, it would be an enlargement
if the constitution were a grant and not a limitation.   As it
stands it is simply a confirmation of the original power of
the legislature.   Upon these considerations, it is submitted
that the constitution does not by *fair and reasonable impli-
cation* prohibit to the General Assembly the exercise of any
of its original power in examining, consummating and de-
claring the result of the election for governor.

It is not an answer to say that an examination conducted
on the principles we have indicated is an exercise of judicial
functions, and as such prohibited, for it is long past argu-
ment in this court that the General Assembly can and does
exercise judicial functions.   *Wheeler's Appeal from Probate,*
45 Conn., 306.   And beyond this, while it is true, doubtless,
that this power has some of the elements of a judicial char-
acter, it is essentially a *political* power, and with the exercise
of its political power by the legislature the courts cannot
legally interfere.   *Rogers* v. *Johns*, 42 Texas, 339 ; *Collin* v.
*Knoblock*, 25 Louis. An., 263 ; *State* v. *Harmon*, 31 Ohio St.,
250; *People* v. *La Salle Co.*, 100 Ill., 495 ;   *Goff* v. *Wilson*,
32 W. Va., 403 ; *Carr* v. *Wilson*, id., 426 ; *Luther* v. *Borden*,
7 How., 1 ; *Georgia* v. *Stanton*, 6 Wall., 50, and cases there
cited.

*Third.* But it is insisted that the constitution expressly,
as well as by fair and reasonable implication, limits the
General Assembly in making its examination to the fair lists

of the canvassing board and the presiding officers' certificates of the *votes counted*, and that this is a material restriction of the power of the General Assembly. What are the returns of the presiding officers which the constitution requires shall be furnished to the General Assembly, and which it shall examine for the purpose of finding out who, if any person, is *legally* chosen? The constitution says they shall be "*lists of the persons voted for and the number of votes given for each*." This clearly means that every vote given by every qualified elector, with the name of the person voted for, shall be included in the return of the presiding officers for the information of the General Assembly. Here we are met with the claim that the constitution requires a list of the *votes* given, not of the *ballots* cast, because *ballots* are not *votes* until they have been not only given and received but also counted and returned, so that all that is necessary to prevent the ballot of a qualified elector from becoming a vote is to throw it out in the count, and the return of the presiding officer which makes no account of the transaction is constitutionally unimpeachable. This distinction between "vote" and "ballot" is purely fanciful. A vote is "a *suffrage;* the formal expression of a will, preference, wish, or choice, in regard to any measure proposed, in which the person voting has an interest in common with others, either in electing a person to fill a certain situation or office, or in passing rules, laws, regulations," etc.  6 Cent. Dict., 6790. A *ballot*, by the same authority, (vol. I, p. 432,) is a slip of paper on which the voter's expression of his will is *written* or *printed.* A *vote* is an expression of the voter's will in any way; it may be orally, by rising, by raising the hand, or by a written or printed word or words, according to the method of voting required, and when the method is by a written or printed slip of paper, the words *vote* and *ballot* and *suffrage* are synonyms, and are used indiscriminately, the only distinction being that *vote* is generic and *ballot* specific.  These citations sustain this view :— "Deliver his *vote or suffrage*." Acts of 1818, p. 312. Same expression. Acts. of 1820, p. 454. See also Gen. Statutes,

State ex rel. Morris v. Bulkeley.

§ 247, where the word "ballots" is used to describe the *votes* counted and preserved in the ballot-boxes, as well as the ballots rejected. See also Opinion of the Judges, 30 Conn., 597, 599, where the word "*vote*" is used as descriptive of a ballot before it has been counted. But the constitution itself furnishes ample evidence that no such distinction was ever contemplated. " The electors present shall be called upon to bring in their *written ballots* for senators. The presiding officer shall receive the *votes* of the electors, and count and declare them in open meeting." Art. 3, secs. 5, 6. "In all elections of officers of the state, or members of the General Assembly, the *votes* of the electors shall be by ballot." Art. 6, sec. 7. "And each elector present at such meeting, qualified as aforesaid, may thereupon bring in his *ballot* or *suffrage* for such person or persons as he shall choose to be senators for such district, not exceeding the number by law allowed to the same, with the name or names of such person or persons, fairly written on one piece of paper. And the *votes* so given in shall be received, counted, canvassed, and declared," etc. 3d Amendment. In this light the use in art. 4, first of the word "*ballots*" and then of the word "*votes*," is easily explained without resorting to the notion of any such distinction as the one claimed. One of the causes of complaint which led to the constitutional convention of 1818 was the tyrannical restraints placed upon the exercise of the elective franchise; notably the odious "stand-up law," which required voters to stand up at elections; and so the constitution, art. 4, sec. 2, provided that when the presiding officer called upon the electors to vote, he should call upon them to vote by ballot, and when these ballots were cast they were "*votes*," and they were the "*votes given*," within the meaning of the constitution requiring a list of the number of "votes given for each." These are the constitutional returns, and when made, as the constitution expressly requires they shall be made, they carry out the fundamental idea of this commonwealth from its earliest days, which the constitution did not discard, that *all* the votes which the qualified electors cast shall be before the

General Assembly when it examines to find out who is legally chosen.

The claim of Mr. Morris to the office of governor stands solely upon the evidence of returns of the votes *counted* and not returns of the votes *given*. By the evidence of these unconstitutional and defective returns he had twenty-six majority of all the votes cast.

*Fourth.* But again the constitution provides that the General Assembly shall, by law, prescribe the manner in which all questions concerning the election of a governor or lieutenant-governor shall be determined. Acting under this mandate, the General Assembly enacted secs. 239 and 240 of the Gen. Statutes of 1888. It will be observed that the certificates required in §§ 239 and 240 are alike called "*returns*," and (§ 251,) that the original returns of the presiding officers are required to be laid before the General Assembly on the first day of its session. The purpose of the General Assembly, at least in enacting the provisions of § 240, is too plain for argument. It meant to prescribe by law the manner in which questions concerning the election of governor might be intelligently and fairly determined, by providing itself with sufficient information, if possible, to find out what person, if any, had been legally chosen. It meant itself to be the tribunal, as the constitution meant it should be. It meant this legislation to facilitate and make sure the performance of that duty of determining all questions arising about the election of governor which the mandate of the constitution had devolved upon it.

To state briefly what is claimed here as to the character of the certificates required in § 240 :—1. They are returns of the presiding officers, and the only returns which show the "*number of votes given*" as the constitution requires.— 2. They are returns of the presiding officers required by the legislature in pursuance of that mandate of the constitution which requires the General Assembly to provide methods by which all questions concerning the election of a governor shall be determined.

Upon the evidence of these returns in the present case no

person can be found to have a majority of all the votes cast, and no person can be found to be legally chosen.

The question now recurs, what is the extent of the legislative power of examination which the constitution requires the General Assembly to make for the purpose of finding out who is legally chosen? An answer to this question is really contained in that mandate of the constitution which requires it to make an *examination* of the returns to the point of finding out who is legally chosen. Such an examination to terminate in such a result must necessarily have scope to include all questions of forgery, falsehood and mistake. It is not simply an examination of the *face* of the returns to find out who appears therefrom to be legally chosen, but an examination thorough and exhaustive and resorting to extrinsic explanatory evidence, if that is necessary to find out who is legally chosen. No general proposition is better settled by authority than the proposition that *whenever* and *however* it is apparent that returns are unreliable, their value as evidence is gone, and other evidence may and must be resorted to. McCrary on Elections, §§ 540 to 544, and authorities there cited; High on Extr. Leg. Remedies, § 638, and authorities there cited ; Paine on Elections, § 596 *et seq.*, and cases there cited; Cooley on Const. Lim., (6th ed.,) 788, 789.

But it is the confident claim of our opponents that the certificate of the presiding officer is final upon the question he certifies to, and that the aggregate of these certificates returned is the only evidence upon which the General Assembly can act. The true dimensions of this claim can best be seen by inquiring what exactly that certificate is, and an analysis of § 237 of General Statutes shows what it is. The way the presiding officer's certificate is made is this :—the counters deliver to the *moderator* a certificate showing "the number of votes counted for each candidate and office respectively; " the *moderator* indorses this certificate as showing the result of the official count, and passes it over to the presiding officer, who certifies the counters' count to be the vote of the electors' meeting over which he

presides. The whole business is in the counters' hands; they count what they please, reject what they agree to reject, and the moderator must indorse their doings as showing a correct result, and the qualified elector who cast his vote and has been practically disfranchised is without remedy. Such is the presiding officer's certificate, and it goes without saying that it ought not to be final, and it is not. Either branch of the General Assembly, confessedly, may go behind his returns, reverse his decisions, correct his mistakes, count as legal votes the votes which he has rejected, and entirely change the result of the election as declared by him in case of its own members. And in case of question about the election of sheriff or judge of probate, a judge of the Superior Court may review the proceedings of these election officials and reverse the results which they have reached. And the same is true in case of any question about any town office. So that we have this state of things: —the election officer's decision that a given vote shall be rejected for an alleged non-compliance with some requirement of the law may be reversed so far as representatives are concerned, but it must stand as to all state officers. If an elector's vote for constable is unjustly rejected, it may be inquired into in court—even in this court—and the wrong righted; but a counter at the polls may deprive him of his vote for governor without just reason, and for this wrong there is no remedy, because the presiding officer's indorsement of the counters' count is final. This cannot be. In a free state there is no such creature known to the law or possible, whose act is final, however arbitrary, despotic, or even corrupt it may be. The state must stand upon the sure foundation of free suffrage. The constitution takes care of this. The General Assembly exercising a power of which it has never been deprived by the constitution, and following, too, the express mandate of that instrument, has made such provision as legislative foresight could suggest to support the privilege of free suffrage. Section 247 provides that all the ballots cast at any electors' meeting shall, after they are counted, be returned to the box,

which shall be locked and sealed up by the moderator, and deposited in the town clerk's office, and kept with the seal unbroken for six months, "to be opened and the ballots examined only by those authorized to make an official examination of them." This section further provides that "if such boxes are opened under authority of a judge of the Superior Court, charged with inquiring into an election, the said judge shall see that all the ballots and the accompanying certificates are returned to the box, and the same effectually sealed up again." There can be no doubt to what end all these provisions point. Ballots to be preserved under lock and seal. What for? Ballots to be preserved for the definite period of six months. Why that time? Boxes to be opened for "*official examination.*" By whom? Boxes to be opened only by "*those authorized.*" Who authorizes? If a judge opens the box he must return the votes to the box and effectually seal it up again. Why? The General Assembly requires the ballots to be kept for the purpose of official examination, and it fixes a period of time for this keeping long enough to extend from any election beyond a stated session of the General Assembly. The boxes are to be opened only by the authority of the constitution or the General Assembly. A judge of the Superior Court may open the boxes in the discharge of his statutory duty of inquiry into an election, but when he is through with the votes he "shall see that all the ballots and the accompanying certificates are returned to the box, and the same effectually sealed up again." There is no explanation of this last part of the section; no other construction possible than that the legislature means that when the Superior Court has finished with the ballots, still the great purpose of their preservation is not accomplished. The legislature contemplates an official examination, beyond the Superior Court, as a possibility, and the only power beyond the Superior Court which can open the boxes and conduct this examination is the General Assembly or either branch thereof, in pursuance of its constitutional rights and duties. These elaborate provisions of the law were made in "support of

the privilege of free suffrage;" were made to the end that this privilege shall never be at the mercy of ignorance or fraud. What more effectual safeguard could this privilege have than the promise of the General Assembly that what is done darkly at the polls shall be exposed to the sunlight of legislative inquiry?

The limitation of this power of examination is the ascertained will of the qualified electors of the state legally expressed, and it has no other limitation.

On two occasions the General Assembly has exercised this power without question and without interference:— in·Gov. Jewell's case in 1871; in Gov. Waller's case in 1884. In the first of these cases the legislature exercised this power, in the matter of election for governor, by tracing' the returns to their source—going to the ballot-boxes themselves and to the men who cast the ballots which were or ought to have been found in them, to trace out and correct illegalities of voting and counting and returning which could not otherwise be detected, because of the defective and deceptive character of the returns of the presiding officers. In the second case the General Assembly exercised this power by going behind the returns of the presiding officers to take cognizance of certain irregularities and passed a validating act to heal the defects of certain votes which were decisive, when healed, of Gov. Waller's election. This power of examination which the General Assembly has exercised, it has never abdicated and can never abdicate; it has never delegated it to any other tribunal and it cannot delegate it. *Brown* v. *O' Connell*, 36 Conn., 432, 447. This case would seem to be of large value to the court because it defines the meaning of the words "manner prescribed by law," which are common to two articles of the constitution, the one under discussion, and the one construed in that case.

That the General Assembly possesses the power for which we contend is not only evidenced by the fact that the constitution requires it, and it alone, to find out who is legally chosen, but, we submit, it is conclusively established by the

consideration that the constitution has invested it with the sole power of declaring who is chosen governor, and by the further consideration that no man can be governor until he is so declared. *Goff* v. *Wilson*, 32 W. Va., 393; *Carr* v. *Wilson*, 32 W. Va., 419; *People* v. *North*, 72 N. York, 124; *People* v. *Crissey*, 91 id., 616; McCrary on Elections, §§ 215, 274. The Superior Court has no power to compel the production of the evidence upon which alone these proceedings in *quo warranto* could be sustained, for the legislature is still in session, and the returns are still in its exclusive control. *Fleming* v. *Guthrie*, 32 W. Va., 1. The Superior Court has no power to make any declaration as to who is governor, and no power to enforce it if it should. Suppose the court finds out who is legally chosen, and makes declaration who is governor, what is to prevent the General Assembly, still in session, from making a different declaration the next day, and enforcing its declaration? *State* v. *Baxter*, 28 Ark., 129. And we submit further that the court will take judicial notice of the action of the General Assembly in the matter of finding and declaring what person has been legally chosen governor, and will take judicial notice of the person entitled to exercise the duties of that office. 1 Greenleaf on Ev., § 36; *Prince* v. *Skillin*, 71 Maine, 361.

*Fifth.* Having discussed these intervening questions, to wit, what are the returns? and what is the extent of the legislative power of examination for the purpose of finding out who is legally chosen? we come to the inquiry as to whether the General Assembly now in session has made the indispensable declaration of some other person to be governor since it declared Gov. Bulkeley to be the governor?

Has the General Assembly made any declaration that any person has been legally chosen? This question can be answered briefly by stating what the General Assembly has done. The Senate, without examination of the returns, its committee refusing the respectful request of citizens* and electors to be heard in the premises, has indeed made declaration that Mr. Morris was legally chosen governor in November, 1890; but the Senate is not the General Assem-

bly. The House of Representatives, without whose concurrence the declaration of the Senate amounts to nothing, having performed its constitutional duty of examination, so far as it could without concurrent action of the Senate, after an examination necessarily incomplete for this reason, has voted that it cannot find that any person is legally chosen. It still makes that declaration. Just exactly what the House did is discovered upon an analysis of the report of the committee. This report discloses, first, an examination of the face of the returns; second, an examination of the returns by the aid of extrinsic evidence. On the first part of this examination it appeared that in the whole state 1289 general ballots had been rejected; that these ballots were all cast by qualified electors; that they had all been received and placed in the box; that they had been rejected from the count after the boxes were closed; that the authority upon which they were rejected did not appear; that 458 of these ballots had been rejected for being double; that 121 of these ballots had been rejected and no cause for rejection assigned; in addition, that 111 ballots were rejected, and a cause for rejection given which was neither specific nor sufficient in the law; and that 536 more ballots had been counted for governor than were actually cast. Upon the second part of the examination the committee found, in addition, that 38 general ballots more had been counted in the town of Norwich than the whole number of ballots cast, 20 of which were for Luzon B. Morris for governor; that in Bridgeport 126 republican general ballots were rejected for having an alleged distinguishing mark, which the committee found was merely a minute speck made by defective printing, and not a distinguishing mark within the meaning of the law; and that 103 of those 111 general ballots hereinbefore referred to as rejected for a cause neither specific nor sufficient in the law, were rejected solely because the word "for" was printed thereon as a part of the title of each office voted for, and that, therefore, the ballots were illegally rejected. Upon these facts the committee reported that no person has a majority of the votes lawfully cast for governor.

This report the House adopted, and upon this report it declared, and still does declare, that it is impossible for it to find and declare that any person whatever has been legally chosen governor.

To sum up all we have urged upon the failure of the General Assembly to make a declaration and the results of that failure:—1. The defendant is holding the office of governor because he was duly declared governor by the General Assembly at its January session, 1889.—2. The General Assembly, which the constitution invests with the sole power of declaring who was legally chosen governor at the election in November, 1890, has not declared any person to have been legally chosen.—3. That branch of the General Assembly which has alone made a constitutional examination of the returns, has declared and still does declare that no person was elected.—4. The action of the General Assembly in examining the votes cast and declaring the result was, and is, an integral part of the election, and such examination and declaration are as much a necessary part of the election as the casting of the votes by the electors.—5. The General Assembly is still in session, and has the power and the sole power at any time to make such declaration.

*Sixth.*—In conclusion we respectfully submit that, upon and for the foregoing considerations, the defendant, Morgan G. Bulkeley, is by right the governor of Connecticut. "If the tenure of an office be fixed for a prescribed term, and until a successor shall be elected or appointed and qualified, neither a resignation, nor the expiration of the term, nor the election or appointment of a successor, will vacate the office or impair the power of the incumbent until the successor is duly qualified." Paine on Elections, § 199. See also—*People* v. *Supervisor*, 100 Ill., 332; *Badger* v. *U. States*, 93 U. S. R., 599; *People* v. *McKinney*, 52 N. York, 374; *State* v. *Jarrett*, 17 Md., 309; *State* v. *Seay*, 64 Mo., 89, 105; *People* v. *Lord*, 9 Mich., 227; *Com.* v. *Hanley*, 9 Penn. St., 513. In *Badger* v. *United States*, above cited, the court held that an officer elected to hold until his suc-

cessor was duly qualified, could not resign at pleasure and
leave the office vacant. Hence we submit that the gov-
ernor of the state cannot be required to examine the elec-
tion returns and ascertain for himself whether one man or
another has been chosen to succeed him. A case might
arise in which he would be mistaken in the result. He is
entitled to have a finding and declaration, official in its
character, before he shall be required to lay down the office
or turn it over to a successor. An attempt by him to de-
cide whether a choice had been made or not would be a
usurpation of the power vested in the legislative department
of the government.

The exclusive investigations of all questions of every
nature pertaining to the chief executive have always been
made by the General Court and General Assembly. No
abdication or delegation of this high service, call it as we
please, duty or prerogative, has ever been made, nor have
they been conceived of, so far as is known, until the present
suit was brought. Under all of the organic acts, the funda-
mental orders, the charter, which is little more than the
fundamental orders enlarged and assented to by the Crown,
the state declaration of its independence and adoption of
the charter in 1776, and the constitution of 1818, this polit-
ical duty of declaring and notifying the chief executive of
his calling to office has been exercised by the General Court
and the General Assembly, which has ever been and is the
supreme political magistracy of our government. Of this
department of government our court says, in the modern
case of *State* v. *Lewis*, 51 Conn., 127 :—" The legislature, in
whom all sovereign power is vested, is limited only by the
Constitution." And any judicial interference with the Gen-
eral Assembly, while it is in the uncompleted performance
of its constitutional duties, would be a nullity. It appears
that one branch of the General Assembly has found a cer-
tain result of the election, after examination to its satisfac-
tion ; that the other branch has found a certain other and
opposite result of the election, after examination to its sat-
isfaction. The duty of harmony is yet before them. And

if there is no harmony to be organized from within, there is no possible harmony to be organized from without. To command the General Assembly to complete its constitutional duties by a direction, emanating from the judiciary, is a constitutional and legal absurdity. The General Assembly is responsible only to the people whom it represents. If either branch fails to fulfil its constitutional duty, then it is to the people alone to whom it must answer. Until the General Assembly has certified a candidate for the supreme executive office, it would be worse than idle, it would be a contempt put upon the constitution and the supreme legislative and political branch of the government, for a member of the Superior Court to attempt to bestow upon him suitable credentials of title, by giving him an execution for ouster of an incumbent, addressed to a constable of a single town or to a sheriff of a single county. A clearer instance than that of the confusion of constitutional magistracies could hardly be created. That the declaration of the General Assembly is essentially a political act, with judicial incidents, is apparent. Especially is it so under our constitution, where, in the event of a failure to find a majority vote for any candidate, the constitution imposes upon the legislature itself the highest possible political function of choosing the governor. Nor is it to be overlooked in the case at bar, that the General Assembly has not only neglected, but, by the action of one of its constituent branches, has absolutely declined to ask the assistance of the judiciary in settling these controversies. Can it be that the Superior Court by a judgment in *quo warranto* will fulfill the high functions of declaring who is governor, which by the constitution was left with the General Assembly, where it has been for nearly two and a half centuries, and which that body can delegate to nobody? We submit, then, that an unsolicited interference by the judiciary with the constitutional duties of the General Assembly, while its two branches have put themselves in opposition to each other, is as unreasonable as, and much more unhistoric than, an interference would be by the executive. In this controversy between the two representa-

tive branches of the legislature, as to whether Luzon B. Morris received a majority of the popular vote last November, and if not, whether he or Samuel E. Merwin shall be chosen by the General Assembly under the constitution, it is no more fitting for the judiciary department to intervene than it would be for the executive department itself to intervene.

But it is said that the constitution contemplates a declaration upon the first day of the session, and, if there is no majority candidate, then a choice by the Assembly upon the second day of the session.  We submit that this assignment of dates is but a direction.  In general, where a statute requires an official act to be done by a given day, for a public purpose, it must be construed as merely directory in regard to time.  *Ex parte Heath*, 3 Hill, 42.  This doctrine has been uniformly maintained by the courts, and nothing is better settled.  *People* v. *Allen*, 6 Wend., 486, and cases there cited ; *Colt* v. *Eves*, 12 Conn., 242, 253, 255, and cases cited ; McCrary on Elections, § 88.  It may be said that this rule is less universal in the construction of constitutional than statutory law, which is true, but there is no such inflexibility of construction of a constitution in this regard as to defeat the very ends of popular government.  These directions are not like a provision of law for a certain number of days' notice to quit possession of a house, or of grace given to the maker of a piece of commercial paper.  They were not enacted to be the foundation of a lawsuit or of a defense to one.  They were put into the constitution to make it the first duty of the General Assembly to ascertain and declare the will of the people at the election, and if the Assembly should find, after a fair examination, that the people had not elected their state officers by a majority vote, then, at once, on discovery of the fact, to proceed to select them from the leading candidates.  With the proprieties or improprieties of the methods of examination pursued by the General Assembly, with their compliance or non-compliance with the directions of the constitution, as to when to make the constitutional declaration and notification,

and when to choose or not to choose his successor, whether on this or that day, this defendant, the executive of the state, has no constitutional right to interfere. That would be an offensive confusion of magistracies. He can do but one thing in order to be true to his oath and to the solemn trusts put upon him by his call to his high office. He cannot abdicate. He must wait until a successor comes to him clothed with the certification which the constitution and the traditions of two hundred and fifty years have made the only evidence of succession. For the appearance of a successor so certified he has waited, willing, and much more than willing, to resign his trust. Until that time comes, he has but a single course of duty to follow, whether it is met by applause or criticism. When such a successor appears, and not till then, he will have filled up the sanctities of his oath, and will have discharged the obligation of his high trust.

*C. R. Ingersoll* and *H. Stoddard*, with whom were *T. E. Doolittle* and *L. H. Bristol*, contra.

The question is, whether the defendant is the rightful and lawful governor of the state of Connecticut. If he is such governor this action must necessarily fail, but if he is not the governor of this state, this action must succeed and a proper judgment be rendered accordingly. The case presents no question of jurisdiction. An unlawful, unfounded and pretended claim of title to the office of governor cannot oust this court of jurisdiction to determine whether in truth and in fact the defendant is by law entitled to such office. Whoever intrudes into any office, it matters not what that office may be, with or without the final evidence of title, may be ousted on proper judicial inquiry, as was decided in the leading case on this subject of *Attorney General* v. *Barstow*, 4 Wis., 567, where, notwithstanding the incumbent had been declared governor by the proper authorities, the court upon *quo warranto* adjudged him to be an intruder, and ousted him from the governorship which he had unlawfully usurped. The question of jurisdiction thus disposed of, the single

issue presented to the court for its determination is, who is governor of the state of Connecticut? Is it the relator, or is it the defendant?

The following are conceded facts in the case:—

—(1.) A general election for governor and other state officers was duly held by the electors of this state on the 4th day of November, 1890, pursuant to the provisions of the constitution.—(2.) The relator, Luzon B. Morris, received a clear majority of all the votes received and counted at the several electors' meetings.—(3.) Lawful returns of such votes were made to the treasurer, secretary and comptroller of the state, and these officials counted the votes so returned, and therefrom it appeared and still does appear that the relator, Luzon B. Morris, had 67,662 votes, and that all other candidates had 67,636 votes; showing a majority for the relator of 26 votes, and if an amended return of votes from Milford is considered, a majority of 44.—(4.) A fair list of such votes so returned was made by the treasurer, secretary and comptroller, as provided by the constitution, from which fair list of votes the above result appeared, to wit, that the relator, Luzon B. Morris, had a majority of 26 votes, received and counted in the presence of the electors and returned as provided by law.—(5.) Said fair list and return of votes, made by the presiding officers of the electors' meetings, were duly laid before the General Assembly on the first day of its session.—(6.) The Senate, after examining the fair list and the returns of the presiding officers of the electors' meetings, thereupon found the vote to be as above stated, and in obedience to the constitution declared the relator to have been elected governor by the electors. —(7.) The House of Representatives had before it the same fair list and the returns of the several presiding officers of the votes received, counted and declared in the presence of the electors, and from these documents the House found that the democratic vote for governor "as returned" was 67,662, and for other candidates "as returned," was 67,636, leaving a democratic majority of 26 for governor "as returned."

The alleged facts put forward to excuse the refusal of the House to make a formal declaration are in substance these:—(1.) The House committee reported that they found that 1289 general ballots were not counted and were rejected at the electors' meetings and in the presence of the electors, and that they "thought" that some of these general ballots so rejected should have been counted for some one, but made no investigation nor any finding as to the person for whom these rejected ballots were actually cast, except by inference, and that only in relation to 159 of the 1289 rejected ballots, leaving a balance of at least 1130 of such rejected ballots, every one of which may, for aught that appears, have borne the name of the relator, Luzon B. Morris, for governor.—(2.) The committee also reported that 126 ballots were rejected in open electors' meeting in Bridgeport, for bearing a distinguishing mark, and, without seeing a single one of said rejected ballots, further reported that in their judgment the mark which the local election authorities, upon inspection of the ballots themselves, held and declared to be a distinguishing mark, was not such a distinguishing mark as to invalidate the ballots " within the meaning of the law."—(3.) The committee also reported that some of the 1289 rejected ballots were, *through error of judgment* on the part of the local election authorities, rejected without sufficient legal cause.—(4.) The committee further reported that in a number of towns the presiding officers, in attempting to make a certificate under section 240 of the General Statutes, in relation to a variety of facts connected with the conduct of the election, had blundered in some particulars.

It is not denied that the local election officers acted fairly, honestly and according to their best judgment. It is not claimed that there were any errors in the count except in Norwich, which error, if any there was, did not affect the result. It is not claimed that any mistake intervened in the return of votes. All was concededly regular and fair, and the only claim made on the part of the defendant is, simply, that mistakes of judgment on the part of the local authori-

ties did exist, whereby certain ballots were rejected which, in the opinion of the committee, should have been counted. And therefore it is now claimed that the House of Representatives, of itself and against the protest of the Senate, has the constitutional right to revise such judgment of the local election authorities, and upon such revision has jurisdiction to determine whether the rejected ballots should have been counted, and thereupon to count them if it so decide.

*First.* The relator contends—1st. That the election was held and consummated by the electors of the state in the electors' meetings held on the 4th day of November, 1890, and that the General Assembly does not participate in the election of governor, but only declares the result as that result appears from certain figures.

2d. That the fair list and the returns of the presiding officers of the vote actually counted and by the board of canvassers laid before the General Assembly are *primâ facie* and presumably correct, and must necessarily stand until altered, amended or set aside by some competent authority.

3d. That under our constitution and practice there is no power on the part of the General Assembly, much less of either house composing it, to alter, vary or amend said list and returns, and that the duty of said Assembly and of each constituent house is simply *ministerial,* to wit., to ascertain from said fair list and returns the result of the election and then to declare that result.

4th. That no unlawful and unconstitutional refusal on the part of the House of Representatives to formally declare the result, as shown by the documents and found by the House, can deprive the electors of the state of their constitutional right to elect a governor, or deprive the relator of the office to which he has been lawfully chosen.

5th. That in the present case both branches of the General Assembly have ascertained the fact to be that the relator received a clear majority of all the votes cast as shown by the list and returns, which are the sole evidence of the fact, but that the House of Representatives, in violation of its duty

under the constitution, refuses to declare what is a necessary inference from such finding, to wit, that the relator was elected.

6th. That if there is power existent anywhere to alter, amend or vary the fair list and the returns of presiding officers, (which we utterly deny), such power can exist only in the General Assembly, which body can act only through the co-ordinate action of the two houses which compose it; that neither house can of its own motion alter or amend said list and returns, because that can be done only by the General Assembly, and that a refusal on the part of either house to change the list and returns necessarily involves a refusal on the part of the General Assembly, because the assent of both houses is indispensable to such change.

7th. That this court will not allow a mere matter of form to stand in the way of an election completed in substance and essence, but will, to prevent a failure of justice, adjudge the relator to be lawfully elected to the office of governor in spite of the refusal of one branch of the General Assembly to perform a ministerial duty by passing the customary formal declaration.

Broadly stated, the position for which the relator contends is, that the right to the gubernatorial office depends upon the election to that office by the electors, and does not depend upon a declaration of the result of that election by the legislature; that the General Assembly does not participate in the election of governor, but only declares the result as it appears from certain figures and papers laid before it; and that the action of the General Assembly in examining the votes and declaring the result is not judicial but ministerial, and is not, therefore, an integral part of the election.

The essence of the relator's claim is, that the action of the General Assembly in examining the returns and declaring the result is wholly and purely *ministerial;* that it is not in the power of the General Assembly, by neglecting or refusing to make a proper declaration, to defeat the will of the people as expressed by the votes of the electors in their meetings in the respective towns; that the act of declaring the result

as shown by the returns is an imperative duty imposed upon the General Assembly by the constitution; that the duty of the General Assembly is in this regard no other than, or different from, that devolving in similar cases on any other returning or canvassing board; that though the duty is imposed on the General Assembly, the quality of the act to be performed by the General Assembly is not altered because it is the General Assembly that is to perform it; that as that duty is a ministerial one, it does not and cannot become a judicial or political duty by reason of the nature of the tribunal to which it is entrusted—it remains purely and simply ministerial always; that if the General Assembly can refuse to declare a governor whom the returns show to be legally chosen, it has practically power to constitute an executive to suit its own purposes, thus strangling and overthrowing the public will; and that such a doctrine robs the people of the executive they have chosen, and may force upon them one who was not even a candidate for their suffrages. The defendant, on the other hand, contends that the duty devolved on the legislature by the constitution is not ministerial but judicial, and that, acting in such judicial capacity, the legislature has the power to examine, alter, amend and vary the fair list of returns laid before it.

It is upon the issue thus made up, whether the duty devolved on the General Assembly is judicial in its character or ministerial only, that the substance of the controversy turns. From that issue as presented by the record there is no escape. Either the duty of the General Assembly is ministerial, purely and wholly, or else it is judicial, with all that judicial power implies,—the right by all proper methods and with the aid of all legitimate evidence and proofs to conduct the inquiry to a conclusion which shall finally determine the rights of the parties. Less than this is to make the granting of judicial power a farce.

The underlying, essential question to be determined is, whether the declaration is an *element* or *only evidence* of title. If the latter, then it necessarily follows that it is no part of the title itself—that the right is perfect without it; and to

prevent a failure of justice, that no wrong may be without
its remedy, the courts will and must, upon the production
of such evidence as may be deemed satisfactory, make good
the omission of the declaration by an adjudication that the
person who has thus proved his title is entitled to the office;
which adjudication, when made, has all the force of the
declaration for which it is substituted, and is promulgated
with the same publicity which that declaration was intended
to subserve.   And so it is that all the authorities, unless
this case prove to be the one exception to the rule, from
Lord COKE down, hold that the *election* is the foundation,
not the *return;* and that *the right* and title to an elective
office depends upon the election, and *is not contingent in any
degree or manner upon* the existence or non-existence of a
certificate or declaration of election.   Cooley on Const. Lim.,
782, 785, 786, 787; Paine on Elections, §§ 625, 626, 634;
High on Extr. Rem., §§ 638, 639, 639*a*; 6 Am. & Eng.
Encyclopedia of Law, 422, 423, and cases there cited.

"If one not legally elected is erroneously declared to be
elected, the will of the people is disregarded.   A usurper
holds an office to which he has no right.   'The usurpation
of an office is not an invasion of the executive prerogative,'
observes NOTT, J., in *State* v. *Deliesseline,* 1 McCord, 52,
'but of the rights of the people, and the only method by
which those rights can be protected is through the instru-
mentality of the courts of justice.'   In accordance with
these views it has been uniformly held by this and all other
courts where the question has arisen, that the decision of
the canvassing board is only *primâ facie* evidence that the
real title to an office depends upon the votes cast, and that
the tribunal before which the question arises will investi-
gate the facts of the election, the votes cast, and the legality
of the action of the canvassing board."   (Citing *People* v.
*Cooke,* 8 N. York, 67; *People* v. *Judson,* 55 N. York, 525;
*People* v. *Vail,* 20 Wend., 12; *State* v. *Governor,* 1 Dutch.,
348.)   Per APPLETON, C. J., in *Prince* v. *Skillin,* 71 Maine,
371.   And it matters not that the body is so constituted
that mandamus will not lie to enforce its duty.   The true

rule is, that if the duty is imposed by law and the act is ministerial, a refusal to act cannot affect the title to the office in *quo warranto* proceedings. *Dennett, Petitioner,* 32. Maine, 508; McCrary on Elections, § 378. " The presumption is that the legislature will perform its duty and declare the result. If, therefore, the rights of a party who has been elected to an office are imperiled by the refusal of a canvassing board, (in that case the legislature), whose duty it is to proceed with the canvass and declare the result, he may confidently appeal to the courts to protect and enforce his rights." *State* v. *Elder,* 47 N. W. Rep., 710, 717.

If, on the other hand, the declaration is an *element of title,* it is evident, no matter whether it is termed "an integral part of the election" or " an indispensable adjunct," the title is not and cannot be complete without it, and no right exists which the claimant can assert in the courts or elsewhere. There is no failure of justice, because no legal right has been perfected; no denial of justice, because the right to demand justice does not come into existence. There is simply a failure to elect, which it is impossible for the courts to supplement or remedy. Is this so? Can it be that the constitution intended to place in the hands of either house or of the whole General Assembly the power to thus defeat the will of the people, and to thrust upon them, for a succession of terms it may well be, a hold-over executive whose only title is found in the " *sic volo, sic jubeo; stet pro ratione voluntas,*" of a partisan majority? Did the framers of our constitution intend to open the courts to all other suitors, no matter how insignificant the office, and to close them only to those whom the people have elected to the highest offices of the state?

In proceeding to the consideration and discussion of those matters which, as we think, bear upon the fundamental issue thus stated, it is well, at the outset, to recall the language of the Supreme Court of Maine in a similar case—*In Re Gov. Garcelon,* 70 Maine, 561, 599. " In a case like the present the remark of Chief Justice MARSHALL, in *Cohens* v. *Virginia,* 6 Wheat., 404, is peculiarly applicable. 'It is

most true,' he says, 'that this court will not take jurisdiction if it should not, but it is equally true that it must take jurisdiction if it should.' The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. We cannot pass it by because it is doubtful. With whatever doubts or whatever difficulties a case may be attended, we must decide it if it be brought before us. *We have no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given. The one or the other will be treason to the constitution.*"

*Second.* The relator insists that the electors have reserved to themselves the exclusive right to elect the governor in the electors' meetings assembled, and that, considered historically, this is true in a high and emphatic sense peculiar to the people of this commonwealth.

1st. The freemen of this colony in the beginning gave, in all else, well nigh unlimited power and jurisdiction, legislative, executive and judicial, to the General Court, but in the single particular of election of governor and other magistrates they excluded the General Court by express negative words, and have always insisted by practice, by law and by constitution, that this privilege should never be parted with. Hooker's Sermon, Johnston's Conn., pp. 71, 72; Fundamental Orders of 1639. The 10th order is as follows:—" In said General Courts shall consist the supreme power of the commonwealth, * * * and (they) may deal in any matter that concerns the good of this colony except election of magistrates, *which shall be done by the whole body of freemen.*" See Laws of 1750, p. 29 ; Laws of 1774; Laws of 1796, § 5, p. 125 ; Laws of 1808, p. 202. See also laws relating to proxy voting, appearing in 1 Colonial Records, 346 ; 2 id., 131; 3 id., 11, 12, 223; Revision of 1750, p. 46 ; Laws of 1784, p. 45 ; Act of 1803, (p. 253 of Laws of 1808;) which last cited act continued to be the law until the adoption of the constitution in 1818. Down to the adoption of that constitution the practice was uniform to appoint a committee under oath to receive and sort the votes and de-

clare the result, who thereupon caused that result to be pro-
claimed before 'the General Assembly. 4 Colonial Records,
p. 41, May session, 1708; 9 id., p. 414, May session, 1749;
id., p. 501, May session, 1750; 10 id., p. 3, May session,
1751; 13 id., p. 4, May session, 1768; 13 id., p. 572, May
session, 1772; 14 id., p. 73, May session, 1774. From the
earliest institution of our government down to the constitu-
tion of 1818 it is impossible to find a single instance where
any action whatever as regards the election was had by the
Assembly as such, or where the canvass made by the com-
mittee appointed for that purpose was other than formal
and ministerial.

2d. In 1818, when the constitution was adopted, there
was no return to be made by the moderators under the law,
other than of the votes that were received, counted and de-
clared in the presence of the electors and in open meeting.
The rejected ballots were not, and at that time could not,
be returned. Ballots rejected were not votes; they formed
no part of the return, and by no possibility could they go
before the General Assembly. The certificates now sent to
the secretary of the state, under section 240, never go either
before the board of canvassers or the General Assembly,
and the board of canvassers have no legal relation whatever
to those certificates. The earlier part of the 2d section of
the 4th article of the constitution defines the returns to be
the duplicate lists of the persons voted for and of the num-
ber of *votes* given for each. A pretended *ballot* which the
local authorities have decided to be illegal, *does not become a
vote*, and it is only those ballots which are by the local
authorities received, counted and declared in open meeting
that can be returned as votes. It is a perverted ingenuity
which finds in the clause that "the General Assembly shall
by law prescribe the manner in which all questions concern-
ing the election of the governor or lieutenant-governor shall
be determined," a constitutional warrant for the substitution
of other evidence and different returns from those which
the express language of the constitution makes the sole evi-
dence of the result. On the contrary, this very language,

if it has any meaning, emphasizes in a peculiarly emphatic way the soundness of our contention. If the constitution intended to give to the General Assembly full power to exhaustively examine and judicially determine the title to the state offices, it would be an utter absurdity, a sheer contradiction in terms, to provide that the same Assembly "shall by law prescribe" some other tribunal to hear and determine those identical questions.

3d. By the constitution each house of the General Assembly is made the final judge of the election returns and qualifications of its own members, but no such power is given to the General Assembly in reference to the election of state officers. This difference is significant. The omission was deliberate and intentional, and is consistent with the entire theory of our form of government, showing a clear intent that the election of a governor should in no wise be dependent upon the will of the General Assembly.

4th. An examination of the journals of the Senate and House since the adoption of the constitution shows that the result of the election has been uniformly declared upon the examination of the fair list and returns of votes; except in 1871, when the General Assembly, by the conjoint action of both houses, (and even then against the protest of the minority,) upon an allegation of fraud, proceeded, not to revise the action of the local authorities, but to do that which the presiding officers might have done. And the whole history of legislation in this state (Acts 1844, 1849, 1859, 1860, 1868, 1871, 1874, 1875) shows that the conduct of electors' meetings is by law committed to the local authorities.

An analysis of the provisions of the constitution demonstrates that the duty devolved on the General Assembly by that instrument is ministerial and not judicial.

1st. It is unquestioned and unquestionable law that the governmental process of election, when once begun, must go on without stoppage to its completion and conclusion. Each agent must perform his duty as it comes to him, and has no power to hold back because some other agent has not

acted, or has not acted to his satisfaction. In the lawful and orderly exercise of the process *there can be no stoppage of its progress until the result is ascertained and declared*, and in the light of this axiomatic truth it is idle to claim that the constitution intended to authorize the legislature to in- terrupt the process of election by giving it power to make a judicial scrutiny of the returns. There are three mandates of the constitution : the presiding officers must send the list to the canvassing board, the canvassers must canvass them, the legislature must declare the result *on the first day*. Nothing can lawfully stop these processes. The interest of the state is that the office shall be filled, and no time is af- forded for the trial of a contested election by the General Assembly; and therefore the General Assembly must de- clare the election after inspection of the fair list and returns of votes actually received and counted.

2nd. Under the constitution *the governor is the person chosen by the electors to coöperate with the legislative depart- ment in the operation of government*, by making laws and otherwise ; therefore, it is necessary that who such execu- tive is to be should be ascertained and declared concur- rently with the opening of the legislative session, and to that end and for that purpose the constitution provides that the returns shall be laid before the General Assembly *on the first day of the session thereof*, and that the Assembly, *after an examination of the same*, shall declare the person whom they shall find to be legally chosen; but if there is no choice then said Assembly shall, on the second day of the session, proceed, *without debate*, to choose a governor. Neither dis- cussion nor consideration is permitted, much less a judicial examination extending over weeks and possibly months, because in that event the machinery of the constitution would fail to carry out its plain intent to provide an ex- ecutive chosen by the electors to coöperate with the legis- lature in the transaction of the business of the state. The only course consistent with our fundamental notions con- cerning frequent elections, or consistent with the language of the constitution, is to accept the fair list and the returns.

of votes as they appear upon their face, declare such result, and leave every question which may arise upon a contest to judicial tribunals. A striking confirmation of this view is found in the language of MAXWELL, J., in the recent Nebraska case of *State* v. *Elder*, before cited. " The legislature is a lawful body, elected and organized in pursuance of the constitution and laws for a lawful purpose, and while within the limits and restrictions of the constitution it may pass any measure it may deem proper, yet morally it is bound by the same considerations of fairness and justice which control the courts and it is its duty to dispose of election contests in this manner. This not infrequently requires investigation of the evidence, which may require weeks or even months in connection with the other duties of the members, *and is wholly irreconcilable with the theory that the declaration of the result of the election should be postponed until the termination of the contest.*"

3d. By the provision of the constitution, *the governor is chosen by the electors at their meetings in their respective towns*, and all subsequent proceedings are simply to preserve and perpetuate the evidence of the result. The constitution first provides that the supreme executive power shall be vested in the governor, "*who shall be chosen by the electors*," and then provides that at the meetings of the electors in their respective towns, " *the presiding officers shall call upon the electors to bring in their ballots* for him whom they shall choose to be governor." By this language the whole power of choosing a governor is entrusted to the freemen of the state. It is by their ballots, received and counted in the presence of the electors, that the election is to be determined, and over these meetings the General Assembly has and can have no power. Within that sphere the meeting of the electors is supreme, and determines by its own proper authority what ballots shall be received, what ballots rejected, and what ballots counted as votes. It is a most significant fact that the constitution contains neither mandate, direction nor instruction of any sort as regards the conduct of the election by the electors in electors' meeting assembled. That is confined to.

the electors wholly and entirely.   It is only after the election
in a town is *completed*, and the ballots *have been counted in
the presence of the electors*, and thereby made *votes*, that the
state for the first time intervenes and directs what steps
shall be taken to preserve the official evidence of the re-
sult, by means of duplicate lists of such *votes*, so that the
General Assembly may declare to the world whom the elec-
tors have chosen to be their governor.   The central idea of
the constitution in this regard is, that *the choice of governor
is to be made by the whole body of·the freemen* and not by any
representative body. ¸*It is the election that decides.*   This
was the very Ark of the Covenant brought by our Puritan·
ancestors from Old England to the New.   As they chose
one man from the whole body of the congregation to be
their ruler in things spiritual, it was not only a natural
but almost a necessary sequence that in things political the
same rule should apply; so that alike, both in church and
state, they should be ruled by one man, chosen by and rep-
resenting in his own person the whole body of the freemen
of the commonwealth.

4th.  As a part of the machinery to perpetuate the evi-
dence of the result of the choice made by the electors in the
electors' meetings, the constitution provides that duplicate
lists, *not of the ballots cast* but of the *votes counted*, certified
to by the presiding officer shall be made; one of which shall
be sent to Hartford within such a period of time that the
canvassing board provided by the constitution shall have a
whole month to canvass the votes returned by the presiding
officers, while the legislature is given but a single day, the
first day of the session, to declare the result.   Is it possible
to suppose that the constitution intended the General As-
sembly to make a judicial scrutiny, when the time for such
scrutiny is limited to one day only ?

5th.  The constitution provides that duplicate lists of the
persons voted for, and of the number of votes given for
each, shall be made and certified by the presiding officers,
one of which lists shall be deposited in the office of the
town clerk.   Under the act of 1803 only one list was made

out and that was deposited in the office of the town clerk as the primary and sole evidence of the result, and a copy only of that list was sent to Hartford for the purpose of informing the General Assembly what the result was. When, instead of such copy, a duplicate list was substituted, its function was not thereby changed. The original, proper and primary evidence of the result still remained in the office of the town clerk, confessedly beyond the power or control of the General Assembly. Can it be that the constitution meant to authorize the legislature to alter and change one record of the result and yet leave the other record of the same result, of equal verity, unimpeached and inviolate?

6th. The constitution provides that the fair list and the returns of the presiding officers shall be laid before the General Assembly on the first day of the session thereof. Now what was the object of laying these lists of returns before the General Assembly? Simply to furnish that body with evidence as to whether it could exercise the power to choose a governor by reason of the failure of the people to elect, and to show it who were the two having the highest vote, from which choice must be made. If a plurality elected there would be no occasion to send the returns to the legislature. And note the language of this section of the constitution: " If no person shall have a majority, then the Assembly shall proceed *without debate* to choose a governor from a list of the names of the two persons having the greatest number of votes, or of the names of the persons having an equal and highest number of votes *so returned as aforesaid.*"

*Third.* The journal of the constitutional convention of 1818 demonstrates the soundness of the preceding positions. The first draft of the constitution presented to the constitutional convention gave the General Assembly power to determine contested elections for the governor (see p. 83 of the journal); but the convention was unwilling to give the General Assembly this power, and adopted Judge Lanman's amendment, which reads as follows: " And said Assembly shall

after examination of the same, declare the person who has a majority of the votes returned as aforesaid to be legally chosen, and give him notice accordingly." The draft of the constitution thus amended was referred to an engrossing committee for the purpose of correcting verbal inaccuracies and errors in phraseology (Journal, p. 67); and that committee, acting under the authority of that resolution, made a few changes in language, among others using the phraseology of the constitution in place of the words of Lanman's amendment. The two forms of phraseology were, however, intended to be and are identical in substance and meaning, from which it appears that the language of the constitution, as it now reads, can only mean that the General Assembly must declare that person elected whom they shall find, *by an inspection of the votes so returned*, to be legally chosen.

*Fourth.* The question now before the court has been settled by the authoritative exposition of the law of this state embodied in the opinion of the judges of this court as to the constitutionality of the Soldiers Voting Act, 30 Conn. R., 591. The court there held that the mandate of the constitution fixed all the essential details of time, place and manner of elections, as follows:—(1.) The time—the first Monday in April.—(2.) The place—the meetings of the electors.—(3.) The voting—to be at the call of the presiding officers, in the presence of the electors, and in such *order* and *manner* as the General Assembly should direct.—(4.) The *votes* to be received, counted and declared in the presence of the electors.—(5.) *Lists* of votes *so* given, received, counted and declared, to be made and certified by the presiding officers of the electors' meetings.—(6.) One of *those lists* to be returned to the secretary of the state, and the other to the town clerk.—(7.) The lists so certified and returned to the secretary, to be canvassed by the treasurer, secretary and comptroller and an aggregate list made therefrom.—(8.) The lists so returned, with those made by the canvassers, to be presented to the General Assembly on the first day of its session.—(9.) The General Assembly to examine the lists of the presiding officers and canvassers,

and declare the choice evidenced *by them*, and notify the several persons elected.—In other words, the court holds that the above procedure is *exclusive* of any other mode; that the examination by the General Assembly *must be confined to the lists laid before it* pursuant to the provisions of the constitution; and that it is the duty of the General Assembly, "after an examination of the *same*," to declare that the election has resulted in *the choice evidenced by them.* This opinion of the Supreme Court was adopted into and made part of the constitution of the state by the subsequent constitutional amendment of 1864, passed by two legislatures and approved by the people, allowing soldiers to vote, but providing that the provisions of the amendment should cease and become inoperative and void upon the termination of the then existing civil war. ·

*Fifth.* An unbroken series of decisions by the courts of last resort in other states is conclusive in the relator's favor. Those cases state that the electors elect, and that the persons or body having the duty to declare cannot look beyond the returns of votes. Such bodies act in a ministerial capacity only, and are subject to and must be governed by the law. *In re Governor Garcelon*, 70 Maine, 561. In this case the Supreme Judicial Court of Maine say:—" The governor and council must act upon the returns forwarded to the secretary. If they purport to be made, signed and sealed up in open plantation or town meeting, they constitute the basis of the action of the canvassing board. No provision is found in the constitution, or in any statute of this state, by virtue of which they will be authorized to receive evidence to negative the facts therein set forth. They therefore have no such power. The presiding officers are to determine whether the ballot offered has a distinguishing mark or figure. * * * But if the ballots have distinguishing marks or figures, it is no part of the duty of the officers of the town to make any report in reference thereto. * * * The governor and council have nothing to do with the question. Their duty is to count the votes, regardless of the fact improperly set forth in the return. They are nowhere

constituted a tribunal with judicial authority to determine what shall constitute a distinguishing mark or figure, nor can they legally refuse 'to open and count the votes returned.' An election has been had by the electors of this state. The rights of several persons voted for depend upon the votes cast. It was the duty of the governor and council thus to declare it. * * * The governor and council have no right to summon a person to attend and take his seat in the Senate or House of Representatives who *by the returns before them* was not voted for, or being voted for was defeated. To summon one for whom no votes had been cast would be a deliberate violation of official duty. To summon those whom the returns show were not elected would be equally such violation. Either would be intruders without right into a legislative body."

So in *Prince* v. *Skillin*, 71 Maine, 361, the court say :— "The real title to an elective office depends upon the votes cast. The underlying principle is, that the election and not the return is the foundation of the right to such an office. It has been uniformly held by this and all other courts where the question has arisen, that the decision of the canvassing board is one of *primâ facie* evidence, that the real title to an office depends upon the votes cast, and that the tribunal before which the question arises will investigate the facts of the election, the votes cast, and the legality of the action of the canvassing board."

"It is settled by the decision of the court in 53 N. Hamp., 473, 641, that the constitution of New Hampshire requires the governor and council to ascertain, not who are chosen, but who appear by the returns to be chosen state senators; *to find the apparent results* of the election, not by acting as judges of the election, but so far as the result appears in the returns *to find it by arithmetic;* to make a computation, not of the votes which would have been cast in a fair election, nor of the legal votes that were cast, nor of the votes, legal and illegal, that were cast, but of the votes which the returns show were declared by the moderators. The duty of making this computation being imposed upon the governor

and council by the constitution, they cannot be authorized to violate it. Their duty is, not to count a part of the returns, but to count them all. * * * It has been argued that to hold the declaration conclusive, so far as the record is concerned, is placing in the hands of the moderator a great and dangerous power, liable to abuse. This is doubtless true to a certain extent." The court then goes on to say that the power must be lodged somewhere, and adds : " This necessity was seen and recognized by the framers of the constitution, as well as a possibility of an abuse of the power necessary to be granted for that purpose. We therefore find that when the power was conferred upon the moderator it was attended with a safeguard as simple, and at the same time as effectual, as human prudence and sagacity could well devise. This safeguard is that the declaration of the vote by the moderator shall be public. The framers of the constitution probably did not look forward to a time when the people of the state should become so indifferent to their political rights and the purity of their government that this would not be sufficient." *Osgood* v. *Jones, supra,* 60 N. Hamp., 282, 621. " Nothing can be clearer than that the counting the votes and ascertaining the majorities and giving certificates of the result, are mere ministerial acts. They have no discretion in determining which of the candidates shall be elected. It must be the result of pure, inflexible, mathematical calculation." *Strong, Petitioner,* 20 Pick., 484, 497, 498 ; *Clark* v. *Board of Examiners,* 126 Mass., 283. See also *People ex rel. Noyes* v. *Board of Canvassers,* 126 N. York, 392 ; *Gatling* v. *Boone,* 98 N. Car., 573 ; *Roberts* v. *Calvert,* Id., 580. The case of *State* v. *Elder,* before cited, is the latest exposition of the law on this subject. The constitution of Nebraska provides that the speaker of the House of Representatives shall, immediately after the organization of the House and before proceeding to other business, open and publish the returns in the presence of a majority of each house of the legislature. The court say :—" This in effect makes the two houses of the legislature a canvassing board with the speaker of

the House of Representatives. In no sense is the canvass of the votes a legislative duty. It might have been imposed on any other body of officers and the duties would have been precisely the same as in the case at bar, namely, to add up the number of votes cast for the several candidates and declare the result. The rule is, that each board is to receive the returns transmitted to it, if in due form, as correct, and to ascertain and declare the result as it appears by such returns. This rule applies to all canvassing boards without exception. By what authority shall the courts discriminate and say, we will compel this board to do its duty but not that one? In a free government no person is above the law; all are bound by its provisions. The legislature is a lawful body, elected and organized in pursuance of the constitution and laws for a lawful purpose; and while, within the limits and restrictions of the constitution, it may pass any measure it may deem proper, morally it is bound by the same considerations of fairness and justice which control the courts, and it is its duty to dispose of election contests in this manner. It seems to be assumed that the legislature has the power, and that therefore at its option it may declare whomsoever it pleases, of the candidates voted for, elected. This is a government of the people, by the people and for the people. The constitution and laws provided a mode in which the will of the people shall be ascertained, namely, by a canvass of the votes."

*Sixth.* If we are right in our contention, that the duty devolved on the General Assembly by the constitution is ministerial only, to hold that the declaration is essential to constitute an election is revolutionary. If the General Assembly can refuse to perform a mere ministerial duty in the present case, it can equally well refuse to perform it in a case where the successful candidate has 10,000 majority and not one of the returns is in controversy. Such a doctrine is monstrous. It says in substance and effect that the neglect of a plain constitutional duty, ministerial in its character, may be made the weapon to destroy not only the will of the people but to overthrow the express provision of the consti-

tution. If this indeed be so, then our social order is at an end, anarchy is upon us, a government of men is substituted for that of law, and it remains only to oppose force by force in a conflict which must subvert all the institutions of the state. In the Garcelon case certain oaths or affirmations were by the constitution prescribed for persons elected to the offices therein mentioned; but it appeared that those before whom the prescribed oaths were to be administered refused to act. But the court said:—" The oath is prescribed; the terms are essential; its binding force depends upon its terms, not on the magistrate by whom it is administered. If there is no governor and council, or being a governor and council they refuse to administer the oath to one representative or to all, for there can be a refusal to all equally as to one, what is the result? Is anarchy to triumph? Can the government be destroyed or its action paralyzed because there is no governor or council before whom the prescribed oath is to be taken? We think not. The prescribed oath, from the necessity of the case, may be taken before a magistrate authorized to administer oaths." " It will hardly be contended," says APPLETON, C. J., in his opinion in *Prince* v. *Skillin*, " that, if by errors of computation throwing out legal returns or counting illegal ones, a candidate not duly elected is wrongfully declared to be elected, there should not be some remedy provided for the party actually elected by which the wrong done may be corrected. If the error is not subject to correction, then the canvassing board in the exercise of irresponsible power have full and absolute control of the government, and may effectually stifle the voice of the people according to their sovereign will and pleasure."

*Seventh.* Waiving, for the moment, all preceding contentions, we further insist that a substantial finding and declaration of the relator's election by the votes as returned was in fact made by the House of Representatives. The committee of the House reported that the democratic vote for governor " as returned " was 67,662, for other candidates " as returned " 67,636, leaving a democratic majority of 26 for governor " as

returned," which report was accepted by the House. It was the plain constitutional duty of the House to make such declaration and finding, and the force and efficacy of such finding and its promulgation to the world by resolution cannot be and is not lessened or impaired by any further or additional statement of the House that no finding could or would be made by the House, or that certain other facts appear by the inspection of other documents. It being the duty of the House to make such finding, the question is, whether it has so done substantially. In *Ex parte Heath*, 3 Hill, 42, the court say:—" That return is special; that ' we have received returns from the several districts of the said ward, etc., copies of which returns certified by us are hereunto annexed. That it is impossible for us to declare what persons were, by the greatest number of votes, elected.' * * * To declare who was elected, the ward inspectors were doubtless competent. Have they done so substantially ? If they have shown an election on the whole return, that gives the right. * * * They have, in the words of the statute, set down the names of the candidates for the respective offices, with the number of votes for each ; and it is admitted that if they had done nothing more, this was, in legal effect, the same as an express declaration of the majority. * * * We are of opinion that the declaration of impossibility by the ward inspectors was a nullity. * * * The case was the same as if they had at first certified, in so many words, an election, according to all the words of the statute, and had then added the qualifying expression. The latter must obviously have been rejected as surplusage." See also cases relating to certificates and returns offered in evidence, referred to in Cowen & Hill's Notes to 1 Phil. Ev., 1045 to 1047, and 1083, 4.

*Eighth.* In any possible aspect of the matter, the fair list and returns of the presiding officers, laid before the General Assembly, are *primâ facie* and presumably correct, and must necessarily stand as the sole evidence of the result until altered, amended or set aside by some competent authority. Such power, if existent anywhere, can under the language

of the constitution exist only in the General Assembly, which body can act only through the co-ordinate action of the two houses which compose it. A refusal on the part of either house to change the list necessarily involves a refusal on the part of the General Assembly, because that body can assent to a change only through the concurrent action of both houses. If it be assumed that a measure of judicial power is given to the General Assembly by the words " the General Assembly shall find and declare," and that under such power the fair lists and returns of votes may be changed, yet by these very words such power is expressly limited to the *General Assembly* and cannot be exercised by one branch of it. The fair lists and returns of votes remain the only evidence of the result, unimpeached and unimpeachable, until the *General Assembly*, by the joint action of its two houses, establishes some fact other and different from that which those returns import.

*Ninth.* To the defendant's contention in the matter we reply—1. The argument that the General Assembly has judicial power to alter and change the fair list and returns laid before it, because such power is not prohibited by the constitution in express terms or by necessary implication, is abundantly refuted by the full analysis of the provisions of the constitution which form part of the relator's contention. 2. It is also contended by the defendant's counsel, that if the examination of the General Assembly is to be confined to the fair lists and returns of votes, it would place it in the hands of the moderators of the respective town meetings to thwart by their action the will of the people. A sufficient and conclusive answer to this claim is found in the language of the Supreme Court of Maine:—"If that officer (the moderator) should make a declaration differing from the count, it would be a failure of his official duty, and, if the act is willful, a clear breach of his official duty. The injunction upon him is to declare the vote truly according to the count, and no provision is made for his disobedience of the mandate, such derelictions of duty being left to the remedies furnished in one way or another by the law. The modera-

tor is thus made an important officer, and is accordingly clothed with powers commensurate to the duties he has to perform. It has been argued that to hold the declaration conclusive, so far as the record is concerned, is placing in the hands of the moderator a great and dangerous power, liable to abuse. This is doubtless true to a certain extent, and it is possible to suppose that an unscrupulous or even a careless and incompetent moderator might cause considerable mischief and wrong by making a declaration at variance with the count." But the court goes on to say *that power must be lodged somewhere*, and adds : " This necessity was seen and recognized by the framers of the constitution, as well as the possibility of an abuse of the power necessary to be granted for that purpose. We therefore find that when the power was conferred upon the moderator it was attended with a safeguard as simple, and at the same time as effectual, as human prudence and sagacity could well devise. This safeguard is, that the declaration of the vote by the moderator shall be public. The framers of the constitution probably did not look forward to a time when the people of the state should become so indifferent to their political rights and the purity of their government that this would not be sufficient."

It is far better that we should endure, until corrected in court, the small temporary evils and effects of the mistakes or even frauds of town and local officers in an election, than that the public should be subject to the evils and effects of the ignorance, partisanship and unscrupulousness of a legislative majority acting through a partisan legislative committee, and were there no other consideration this one ought to be conclusive. But in our freemen's elections no ballot can be rejected without the concurrence of two counters of different politics, nor except by the decision of the moderator made in open meeting in the presence of the electors, before any contest has arisen and before it is known what the effect of his ruling is to be upon the result of the election. *Should he decide wrongfully the courts are open to give ample and prompt redress.* The chances of willful error are

thus reduced to a minimum, and all errors and mistakes can be corrected by legal process.

The Senate and House of Representatives cannot agree as to the duty of the General Assembly under the constitution, relative to the formal declaration of the result of the last election for state officers. For many months persistent and continuous efforts have been made by both branches of the General Assembly to find some peaceful solution of the difficulty, but the disagreement is radical and final. The people of the state are also divided into two great sections, holding the same discordant views. The machinery of our government has broken down, the business of the state is paralyzed, the public peace is seriously menaced, and the fair fame of the commonwealth is threatened. The only existing remedy for these evils is now sought. The judicial department of the government is appealed to. A suit at law is brought to obtain an authoritative, judicial, and final exposition of the constitution from the only tribunal invested by law with the peculiar jurisdiction of construing our fundamental charter. The people of the state with entire unanimity are anxiously awaiting the decision of this court. Both the Senate and the House, recognizing that the judgment of this court in the case now here ought to determine the difference and put an end to the present unfortunate condition of public affairs, have adjourned their sittings to await the promulgation of the opinion of this court. That opinion is also awaited with just solicitude by the people, as well as by both branches of the General Assembly, not only because of the present relief to the existing state of affairs, but in a high degree because of the great and manifest difficulties, doubts and dangers that may otherwise be involved in our next and succeeding state elections.

ANDREWS, C. J. This is an information in the nature of a writ of *quo warranto*. It alleges that the respondent since the tenth day of January last has used and exercised the office of governor of this state, and threatens and intends to con-

tinue to use said office, its dignities, liberties and franchises, and prays that he may be required to show by what warrant he claims to use and exercise said office. The respondent demurred to the information. The Superior Court made a finding of certain facts other than such as are set forth in the information, which includes the senate and house journals, to which the parties agreed, and reserved the case for the advice of this court.

The questions reserved are attended with serious difficulties. These, as well as the novelty of the circumstances recited in the information, the condition of legislation as applicable to those circumstances, the public interests involved, and the delicacy which the court cannot but feel lest it be thought to infringe upon authority belonging to the other co-ordinate branches of the government, have led us to hold the case under deliberation for a somewhat longer time than is usual, and require a careful exposition of the principles upon which the advice to be given is founded. The case was argued at the bar with great force and ability. The view taken by the court departs considerably, in form, from the claims made by either side in their briefs. It is believed, however, that in essential principles there will be found no real difference between the counsel and the court.

The case finds that the respondent, Morgan G. Bulkeley, was legally elected governor by the General Assembly on the 10th day of January, 1889, (there having been no election by the people,) and entered at once upon the duties of that office. The term for which he was elected was till the Wednesday following the first Monday of January, 1891, and until his successor was duly qualified. If then no successor to him has been chosen, or being chosen has not become duly qualified, the respondent still holds the office of governor. He holds that office since the said Wednesday in January, 1891, by the same warrant that he held it prior to that date, and continues to be the *de jure* governor of the state. It is admitted that no person has been chosen to be the successor of the respondent, unless the facts set forth in the case show that the relator has been so chosen; and there

is no claim but that, if so chosen, he is duly qualified. The inquiry then is :—Has the relator been chosen governor according to the constitution and the laws ?

The election of a governor is the selection of some person to fill that office. The selection must be of one who possesses the required qualifications, and must be made by those who possess the right to vote, and at a time and place and in the manner prescribed by law. The election of state officers in this state is a process. It includes the preliminary registration, by which those persons who have the right to vote are determined ; the time when, the place where, and the manner in which the votes are to be given in, and also the manner in which the votes are to be counted and the result made known. Each of these steps must be taken in pursuance of the law existing at the time the election is had. That part of the election process which consists of the exercise by the voters of their choice is wholly performed by the electors themselves in the electors' meetings. That part is often spoken of as the election. But it is not the whole of the election. The declaration of the result is an indispensable adjunct to that choice ; because the declaration furnishes the only authentic evidence of what the choice is. The right to choose any state officer, unless the result of the choice can be published in some way so as to be obligatory on the whole state, would be no better than a mockery ; it would be to give the form of a choice without the reality. The declaration is the only evidence by which the person elected can know that he is entitled to the office, or the previous incumbent know that his term has expired. The courts can take judicial notice of the fact of an election, but never of the result of an election or of who is elected until some declaration is made. The declaration is the only evidence by which the other departments of the government and the citizens generally can know whom to respect as such officer. And in order that a declaration shall be made of the result of an election for governor in a way to be obligatory upon everybody, the constitution has fixed the time and manner in which the General Assembly shall make that declaration.

Unless the declaration is made in the way so provided, the process of the election is not complete. No other authority than the General Assembly is empowered to make such declaration. It is found in the case that there had been no declaration by the General Assembly that the relator had been elected governor, and it is not claimed that there has been any equivalent act by any other authority. It follows that the relator—whatever any future inquiry may show—cannot now be said to have been elected to the office of governor; and that the respondent remains the *de jure* as well as the *de facto* governor of the state. It is therefore the duty of all citizens, of the courts, of all departments of the state government, and of both houses of the General Assembly, to respect and obey him accordingly.

This however is far from deciding the real question that is reserved for consideration. That real question is this:—The relator claims to have received a majority of all the legal votes cast for governor at the electors' meetings held on the fourth day of November, 1890, and that he is entitled to be declared elected to that office. Is there any way known to the law by which he can now establish the fact of such majority and secure his right to the office?

In considering this question the attention of the court has been fixed on a subordinate one. Is the present General Assembly without the power to make any declaration as to the election of a governor? It is conceived that the present Assembly may be without such power, either because it has become impossible for it to do so by reason of the attitude of the two houses towards each other on that matter, so that as to such a declaration the Assembly is in the same condition that it would be if an adjournment without day had been taken; or because the time within which the General Assembly may declare a governor to be elected is limited by the constitution, and that limit is passed as to the present Assembly. And if the General Assembly is without the power to make such a declaration, may the Superior Court make an investigation, and on finding that the relator did in fact receive a majority of all the votes lawfully cast for gov-

ernor, give him a title to that office? The grounds upon which the power of the Assembly to make any declaration respecting the election of a governor are supposed to be lost, will be examined separately, although at the risk of some little repetition.

That part of the constitution which must be kept in mind is section 2, art. 4, which is as follows:—

"At the meetings of the electors in the respective towns in the month of April (now November,) immediately after the election of senators, the presiding officers shall call upon the electors to bring in their ballots for whom they would elect to be governor, with his name fairly written. When such ballots have been received and counted in the presence of the electors, duplicate lists of the persons voted for and of the number of votes given for each shall be made and certified by the presiding officer, one of which lists shall be deposited in the office of the town clerk within three days, and the other within ten days after said election shall be transmitted to the secretary, or to the sheriff of the county in which such election shall have been held. The sheriff receiving said votes shall deliver or cause them to be delivered to the secretary within fifteen days next after said election. The votes so returned shall be counted by the treasurer, secretary and comptroller within the month of April, (now November.) A fair list of the persons and number of votes given for each, together with the returns of the presiding officers, shall be by the treasurer, secretary and comptroller made and laid before the General Assembly, then next to be holden, on the first day of the session thereof. And said Assembly shall, after examination of the same, declare the person whom they shall find to be legally chosen, and give him notice accordingly. If no person shall have a majority of the whole number of said votes, or if two or more shall have an equal and the greatest number of said votes, then said Assembly on the second day of their session, by joint ballot of both houses, shall proceed without debate to choose a governor from a list of the names of the two persons having the greatest number of votes or of the

names of the persons having an equal and highest number of votes so returned as aforesaid. The General Assembly shall by law prescribe the manner in which all questions concerning the election of a governor or lieutenant-governor shall be determined."

It is undoubtedly true that the constitution contemplates that the declaration of the election of a governor—and perhaps of all the state officers—shall be made in all cases by the General Assembly; and that the declaration when made in accordance with the provisions of the constitution shall be final and conclusive. The declaration is that the person declared is legally elected governor. When the people, speaking in their sovereign capacity by the constitution, appoint a single tribunal to ascertain and declare a certain result, and that tribunal does so ascertain and declare, there is no other authority that can interfere with or revise such declaration and change the result. The declaration of the result of an election is to be made by the General Assembly, and must be made by both houses acting jointly or concurrently. A declaration by one house without the other would have no effect.

The constitution by its own terms provides no evidence of the election of a governor from the examination of which the General Assembly is to make the finding and declaration, except the "fair list" prepared by the treasurer, secretary and comptroller, and the returns of the presiding officers. In the absence of all legislation on the subject, and in all ordinary cases, the intent of the constitution would seem to be that the General Assembly should declare that result of the election which is shown by the fair list and those returns. The constitution commands the General Assembly to prescribe by law the manner in which all questions concerning the election of governor and lieutenant-governor shall be determined. If there already has been or hereafter there shall be legislation pursuant to that command and other evidence thereby made admissible, the intent of the constitution seems to be equally clear that the General Assembly shall also examine that evidence in

making its finding and declaration as to the result of an election.

The word "return" is a word known in the law and had the same meaning seventy years ago that it has now. 3 Blackstone's Com., 273. When a command has been issued from some superior authority to an officer, the "return" is the official statement by the officer of what he has done in obedience to the command or why he has done nothing. Whatever thing the superior authority may require the officer to do, of the doing of that thing it may require him to make return. The return made by the presiding officer of an electors' meeting is his official statement of what was done at that meeting. If the General Assembly can require of the presiding officers no return of things other than such as were required by the constitution itself, then it must follow that the General Assembly can require the presiding officers to do no other thing than such as they were required to do at the time the constitution was adopted.

If this is so, then every election law that has been passed since that time is unconstitutional; for there has been hardly one of them that has not in some way changed the method of the choice or the duties or the powers of the presiding officers. A construction so narrow and literal as this cannot be successfully maintained.

Section 239 of the General Statutes repeats the duties required by the constitution to be performed by the presiding officers of the electors' meetings, and adds certain others as follows:—" The presiding officer of each electors' meeting in every town * * * shall make out triplicate lists of the votes given in their respective towns for each of the following officers, viz.; governor, lieutenant-governor, treasurer, secretary, comptroller, senator, judge of probate, sheriff and representatives in Congress; * * * two of which lists he shall seal and deposit in the post-office in said town, the postage being paid thereon, directed to the secretary of the state at Hartford, one within two days, the other within not less than five nor more than ten days after said meeting, and

the third he shall deliver to the town clerk of said town within two days after said meeting."

Section 240 of the statutes is as follows :—" The presiding officer shall, with the certificates upon the result of the electors' meetings which he is required to send by mail to the secretary of the state, send to the secretary his certificate of the whole number of names on the registry lists, the whole number checked as having voted at such election, the whole number of names not checked, the number of ballots found in each box, namely, 'general' and 'representative,' and the number of ballots in each box not counted as in the wrong box, and the number not counted for being double, and the number rejected for other causes, which other causes shall be stated specifically in the certificate. The secretary shall enter said returns in tabular form in books kept by him for that purpose, and present a printed report of the same to the General Assembly at its next session." These sections are claimed to have been enacted in obedience to the commands of the constitution.

It appears from the information that certificates conformable to the requirements of both these sections were sent to the General Assembly and were laid before it on the first day of the session; that the Senate had examined the fair list made by the treasurer, secretary and comptroller, and the certificates sent by the presiding officers from all the towns, so far as they fall within the requirements of section 239 of the statutes, and has declared those persons to be elected to the several offices who appear to be elected by that examination; but that the Senate has refused to examine said certificates so far as they are required by section 240 of the statutes, and declares that it has no constitutional power so to do ; indeed, declares that it is forbidden by the constitution to do it.

The House of Representatives, on the other hand, has examined said certificates,—as well that part which is required by section 240 as that part required by section 239—and declares that it is unable to find that the relator is elected

governor, or that any other of the officers named therein, except the comptroller, is elected.

The fourth section of a resolution of the House is—"that the House will take no action declaratory of the result of the late election for state officers until the Senate shall have taken action in the matter of an examination of all the returns from the presiding officers, including those made under section 240 of the Revised Statutes of 1888, by a joint select committee on canvass of votes." The attitude of the two houses of the Assembly is that of complete and total opposition; on the one side the Senate declaring that it is forbidden by the constitution to examine the certificates made under section 240; and on the other side the House declaring that it will take no action till the Senate shall have recognized those certificates. Their positions seem to be wholly irreconcilable.

The unpleasant suggestion contained in the briefs that either house of the Assembly is acting from partisan motives, can find no place in the mind of this court. Every presumption is that the legislature is solicitous to obey the constitution in its true spirit and that neither house will intentionally violate it. So when each house has spread upon its journal a conclusion radically antagonistic to the conclusion of the other upon the same subject, it can only be regarded as an announcement that they are unable to agree.

In the process of the election of a governor the constitution intended that the General Assembly should perform the closing part. That the present General Assembly seems to be unable to perform that part in respect to the last election this court is compelled reluctantly to admit. But as the Assembly has not adjourned, and as it is legally possible for either house to recede from the position it has taken, the court is not now prepared to hold that it has lost the power on this ground of acting further in the matter of the declaration of the election of a governor.

Prior to the adoption of the constitution under the operation of the charter of 1662, the General Assembly possessed all the power, legislative, executive and judicial, which it is

possible for any civilized government to possess. As ex-
pressed at the time, it was King and Parliament. Its acts
and decrees bound the people as fully as though every per-
son was present within the four walls where its deliberations
were carried on and had expressly consented to them. Such
power could hardly fail at times to operate harshly. Many
motives may have contributed to the formation and adop-
tion of the constitution, but they all centered in, or rather
sprang out of, the one idea to limit the power of the Gen-
eral Assembly.

The constitution of this state is such a limitation in all
cases covered by its provisions, leaving the power of the
Assembly unimpaired in other respects. Whatever limita-
tion there is upon the Assembly in respect to the time with-
in which it must make the declaration of the election of
governor, is to be found in the language of the constitution
above quoted. That language is to be read, in order to get
its true meaning, in the light of the conditions and circum-
stances existing at the time the constitution was framed.
Up to that time the governor had in all cases been elected
or declared to be elected by the General Assembly on the
first day of its session. The sessions were then short, rarely
exceeding ten days. There was no reason then apparent
why the sessions should become longer. Under the consti-
tution there was necessity to have a governor at the very
beginning of the session, in order that he might approve the
acts of the Assembly and the business of legislation go on.
And so the instrument provided that the fair list made by
the treasurer, secretary and comptroller, together with the
returns of the presiding officers, should be laid before the
General Assembly on the first day of its session holden next
after the electors' meetings, and that the Assembly should
examine the same, and find who, if any one, was elected,
and make the declaration accordingly. Immediately follow-
ing it provides that the Assembly, on the second day of the
session, shall, in case no person has a majority of the whole
number of votes, proceed to elect a governor. Here the
time is fixed by affirmative words—" the second day." Af-

firmative words are often in their operation negative of other things than those affirmed. Thus a statute which provides that a thing shall be done in a certain way carries with it an implied prohibition against doing that thing in any other way. An enumeration of powers in a statute is uniformly held to forbid the things not enumerated. When Congress gave the Supreme Court of the United States appellate jurisdiction in certain specific cases, it was held to forbid that court from exercising appellate powers in all other cases than those specified. When national banks were empowered to make loans on personal security, it was holden that such a bank could not make loans on the security of a mortgage on real estate.

In an instrument which is a limitation of power this rule of interpretation applies with more force than in a statute that confers power. To what end did the constitution command the General Assembly to proceed to elect a governor on the second day of its session, if notwithstanding such command the Assembly is at liberty to proceed to elect on any other day? If the command to proceed to elect on the second day is not a prohibition to elect on any other day of the session, then the command has no force, and the instrument which was intended to be a limitation of power, in one of its most important particulars fails to be a limitation at all. When the constitution commands a certain course to be pursued that course must be pursued strictly. It is not a proceeding which may be varied for another deemed to be equally eligible except by disregarding the constitution itself. And when the constitution directs the General Assembly to proceed to choose a governor on the second day of its session, it in effect forbids any choice of a governor by the Assembly at any later day of the session. But the Assembly can never proceed to the choice of a governor unless there has been a previous determination that no person has a majority of all the votes. The power of the Assembly to choose a governor depends upon a previous examination, finding and declaration that no person has received such majority, and as this finding and declaration must

precede the right of the Assembly to choose the governor, it cannot be later than the second day of the session. The constitution provides that the fair list made by the treasurer, secretary and comptroller, and the returns from the presiding officers, shall be laid before the General Assembly on the first day of its session, and that the Assembly shall, after an examination of the same, find and declare. When examine? and when declare? It would seem that it must be done at once, and that the direction so to do is included in the very words used. It is obvious that the declaration of the result cannot be delayed so long as to prevent the Assembly, in case no person is chosen, from proceeding on the second day to choose a governor. The power to declare that no one is elected governor implies necessarily the power to declare that some one is elected. If the former is cut off by the words of the constitution after the second day of the session, the latter is also cut off after that day.

This opinion is not now for the first time advanced. In 1831 there was no choice by the people 'of a lieutenant-governor. The two houses of the General Assembly were unable to unite in a joint ballot on the second day of its session, and there was no lieutenant-governor chosen that year. It seems to have been taken for granted that any choice at a later day would be invalid. In 1871, the General Assembly, both houses concurring, upon information that a fraud had been committed in one of the cities of the state, sufficient to change the result in the choice for governor as it appeared by the returns of the presiding officers, by its committee investigated the matter and found that a great fraud had been committed, and thereupon declared that person to be elected who was found to be rightfully elected, although it was contrary to the result which appeared by the returns of the presiding officers. The Assembly that year contained many members who were lawyers of distinction and ability. It is known that the opinion of almost every other eminent lawyer in the state was obtained, and while there was great difference in their opinions as to the power of the General Assembly to make the investigation, there was

no difference in their opinion as to the time when the result of the investigation, if one was made, must be declared, and the result in that case was declared on the second day of the session. In 1883 a somewhat similar case happened in the General Assembly. In each of these cases the opinion prevailed that the declaration in respect to the election of governor could not be made so late in the session as to prevent the Assembly, in case there was no choice, from proceeding on the second day to choose a governor. So far as usage can be relied upon to afford a correct interpretation of the constitution in this particular, it is uniform in one direction.

It may be urged that the necessity resting upon the General Assembly to examine the fair list and the returns of the presiding officers is inconsistent with the duty to make the declaration so early in the session. The words of the constitution on which this argument rests are found in the section already quoted, as follows:—"And said Assembly shall after examination of the same declare the person whom they shall find to be legally chosen, and give him notice accordingly." An examination may be very general or it may be very particular. Whether it is to be the one or the other in a given instance must be largely determined by the purpose for which the examination is made. The examination which the Assembly is directed to make is for the purpose of finding who, if any one, is chosen governor; and not only that, but who is legally chosen. "To find," in the meaning of the law, is to ascertain by judicial inquiry. And the command to find and declare who is legally chosen, means that the examination shall be sufficiently full and careful to determine the title, so that the person declared to be chosen shall have an unimpeachable title to the office. It is doubtless highly desirable that there should be a governor at the very beginning of the session of the Assembly. But it is still more desirable that there shall be no question about the title of the governor. To induct a person into the office of governor whose title was open to dispute and who might be adjudged not to have been elected, would be to invite discord and delay. Those who were dissatisfied with his title

would refuse to go on with legislation, animosities might be provoked, the public business would be neglected, and a condition of things alike discreditable to the participants and the state would be likely to be produced. Such a course would bring about the very evils which the examination that the General Assembly is directed to make was intended to prevent. The time and manner of the performance by the General Assembly of the duty to examine and find, must be construed in connection with the means provided, or which may be provided, for its performance, and as applicable to that condition of things which will exist when the General Assembly shall have prescribed suitable laws for its performance. That condition of things, which now exists solely because of the neglect of the General Assembly to prescribe suitable laws in this respect, cannot properly be urged as a reason for holding that the General Assembly should have a wider authority or a longer time for the examination, finding and declaration. The concluding sentence of that section of the constitution above quoted is, that "the General Assembly shall by law prescribe the manner in which all questions concerning the election of governor and lieutenant-governor shall be determined." By this direction the wisdom of the Assembly is left unfettered as to the laws by which it shall prescribe a manner for the determination of questions concerning the election of a governor and lieutenant-governor. It may require other and more complete returns from the presiding officers of the electors' meetings, or from the other officers of the election, as the registrars, counters and the like; or it may empower existing tribunals, or create other tribunals, to hear and report upon or decide all matters and questions which may arise at any electors' meeting in any voting district; only it would seem to be necessary that all such returns, or reports, or decisions, must be laid before the General Assembly on the first day of its session, to the end that it may itself make the final examination, finding and declaration, as required by the constitution. When the Assembly shall have performed this duty and shall have prescribed adequate

laws for the determination of these questions, then the examination, the finding and the declaration will be a matter of no intricacy or doubt, and can readily be done on or before the second day of the session.

It is a high tribute to the sobriety and to the respect for law which pervades the people of this state that for almost a century no disputed election has happened which imperatively called on the General Assembly to enact laws for the determination of the questions that arise in election contests. Such a disputed election has now come. It is perhaps not too much to hope that the General Assembly will make haste to put an end to the anomalous condition of our election laws.

The certificates, or returns, for both words are used, prescribed by section 240 of the statutes to be sent to the secretary by the several presiding officers, appear to be a compliance by the General Assembly with the direction of the constitution in this behalf. No argument can be needed to prove that what the General Assembly was commanded by the constitution to prescribe it was its duty to examine. The uncertainty attending these certificates is that the secretary is not directed to lay them before the Assembly on the first day of its session, nor is it by any specific words made the duty of the General Assembly to examine them, or to act on them if examined, and so it is claimed that either house is at liberty to disregard them if it chooses to do so.

This topic and some of the others considered have perhaps received more attention than their importance demanded. Every occasion for their application will doubtless be speedily removed by further legislation.

It has seemed to some of the members of this court that the General Assembly has no power subsequent to the second day of its session to make a declaration that any person is elected governor, or that no person has received a majority of all the votes and so that no person is elected; and that therefore the present Assembly has no power to declare the relator to be elected governor. But as this

point was not fully argued at the hearing, and as a decision upon it might affect other persons than those who are parties to this proceeding, the court does not now attempt to decide it.

From the facts spread out in the information it appears not only that the election process has broken down, so that there is a failure to elect a governor, but that all legislation has ceased. Owing to the difference between the branches of the Assembly an entire collapse in the legislative department has ensued. Whether this condition has resulted from one or the other of the causes we have mentioned it is not necessary to decide. In these circumstances is it not possible that the Superior Court may make an investigation, and on finding that the relator received a majority of all the votes lawfully cast for governor on the fourth day of November, 1890, (whatever the returns of the presiding officers may show,) establish his title to that office by some judgment that shall be legally equivalent to the declaration which should have been made by the General Assembly ?

It must be carefully kept in mind that the courts have no function to perform in the process of an election. They disclaim any such power. The Superior Court cannot make the declaration which the constitution says shall be made by the Assembly. The utmost that the court can do in a case like this is, by some judgment which it can lawfully make to supply an omission or heal a defect. In the life of a state it may often happen that an occasion arises calling for the application of remedies which in the ordinary current of affairs would not have been thought to exist.

Whatever view of the workings of the constitution may be taken, no one can suppose that it intends to afford opportunities for any state officer to hold office longer than the term for which he has been specifically elected. The constitution provides for regular biennial elections for governor. There is the provision that the governor shall hold office until his successor is qualified. This was designed to cover exigencies always supposed to be brief. Until the present instance it was never imagined that the practical

operation of that provision would be to require or permit any governor to hold over for a large part of the term intended for a successor. It is only because of the singular omission on the part of the General Assembly to prescribe suitable laws by which all questions concerning the election of governor shall be determined, that the present instance has been made possible. On the 4th day of November, 1890, the voters of this state expressed their choice for him whom they would elect to be governor. They intended to choose a governor to hold office from the Wednesday following the first Monday of January, 1891, to the corresponding Wednesday in January, 1893. The respondent was not one of the persons voted for. At the same election they also chose members of the General Assembly, to whom they committed the duty of examining the results of their choice for governor, and declaring the person who was elected, and of choosing a governor in case they had made no choice themselves. By the defects in legislation already mentioned, the will of the people in this respect has failed to be accomplished. A very great wrong is being done to them. The relator claims to have received a majority of all the votes cast for governor at said election. If his claim is correct a great wrong is being done to him. He has come into court seeking to establish his right to that office and to obtain redress for that wrong.

It might be argued that it would bring deserved obloquy on the jurisprudence of this state if there was no way in which the relator could establish the right which he claims. It is of the very essence of civil liberty that every individual shall have the protection of the laws whenever he receives an injury. At page twenty-three of the third volume of Blackstone's Commentaries two cases are mentioned in which a remedy is afforded by the mere operation of the law. "In all other cases," says that author, " it is a general and indisputable rule that where there is a legal right there is a legal remedy by suit or action at law whenever the right is invaded." As a general proposition this rule is not denied. But it is urged that the General Assembly is the

exclusive tribunal which has cognizance of the election of a governor. If, however, the General Assembly refuses to act, or if it be so that the General Assembly has jurisdiction of the election of a governor only in the manner and at the time pointed out by the constitution, then the relator is remediless unless the court may intervene. When the time is past within which the General Assembly may act its jurisdiction is gone. To hold that the Assembly has such exclusive jurisdiction, and that the court in no case can have the right to act, would be to afford an instance where a flagrant wrong was without a remedy. That such a result might follow is a powerful reason why that construction ought not to be adopted. Blackstone, at page 109 of the same volume cited above, speaking of what injuries are cognizable by the courts of the common law, adds:—"And herein I shall for the present only remark that all possible injuries whatsoever that do not fall within the exclusive cognizance of either the ecclesiastical, military or maritime tribunals, are for that very reason within the cognizance of the common law courts of justice; for it is a settled and invariable principle in the laws of England that every right when withheld must have a remedy and every injury its proper redress."

The Superior Court of this state as a court of law is a court of general jurisdiction. It has jurisdiction of all matters expressly committed to it and of all others cognizable by any law court of which the exclusive jurisdiction is not given to some other court. The fact that no other court has exclusive jurisdiction in any matter is sufficient to give the Superior Court jurisdiction over that matter.

A trial by the Superior Court of the questions presented in the information would not be an infringement upon the powers of the co-ordinate branches of the government. Not of the legislative, if it has been made to appear that the present legislature is wholly unable to act in the case. It is no infringement upon the executive powers to decide who is chosen governor. To decide what person is lawfully elected to any office is a judicial process, and where there

is no tribunal specially authorized to make such decision, the courts must decide. And the courts always have jurisdiction unless the decision of the special tribunal is final and conclusive. And where such special tribunal exists, if it refuses to act, or from any cause fails to act, then the courts upon general principles, to prevent the failure of justice, and perhaps, to prevent anarchy and misrule, would seem to be authorized to make the decision.

The contention made in this case in behalf of the respondent is, that his right to hold the office of governor continues till the title of a successor to that office is established. The converse of this is admitted—that if the title of the relator to the office of governor is established, his right to hold that office would cease. It seems then that there can be no interference with the executive power in this case.

Such arguments would come with great force and present a very strong case. But if the court was fully convinced by them, and even if it should decide that the present Assembly was without power to make any declaration of the election for governor for either of the reasons discussed, still judgment could not be rendered on this information. It does not contain the necessary averments.

In point of form, in the present action, it is the right of the respondent to exercise the office of governor that is in question. But as the right of the respondent depends upon the election of the relator to that office, it is really the title of the relator that is on trial. If the relator has been completely elected then the right of the respondent to hold the office is ended. If the relator has not been elected then the right of the respondent continues. The claim made in behalf of the relator is that he ought to have been declared elected by the General Assembly, because, as appears by the returns from the presiding officers, he received a majority of all the votes cast for governor; and as the Assembly did not do so, the court ought now to declare him elected or to regard him as having been elected by such apparent majority. This claim admits that if the General Assembly had declared

the relator elected upon the returns the declaration would give him only a *primâ facie* title to the office; and that if inducted into it upon such declaration, he might be ousted therefrom upon its being shown that he did not in fact have the real majority of the votes cast for governor. If the court should declare the relator elected upon the same returns it could give him no stronger title to the office than a declaration by the General Assembly. He could still be ousted upon a proper proceeding. It would be most unseemly for the court to occupy itself in putting the relator into the office of governor, if by any possibility it might happen that the court would be required to remove him from that office as soon as he began to exercise it.

The writ of *quo warranto* is the form of action specially adapted to try the right to an office. But it tries only the real title. It can never be used to try an apparent title. It gives judgment on that title alone which cannot be afterwards called in question. The information does not allege that the relator had the majority of all the votes, but only the majority as it appeared by the returns of the presiding officers; while other parts of the information show that such apparent majority is in dispute. Nor does the information contain any allegation of facts which show that the General Assembly has become unable to decide upon the relator's right to the office he claims.

If the relator shall hereafter, by an amendment of the present information, or by a new one, allege that he received a majority of all the votes lawfully cast for governor on the 4th day of November, 1890, and it shall also appear from the facts therein stated that the General Assembly is without the power to make any declaration in respect to the election for governor, a case would be presented of which the Superior Court might take jurisdiction.

The Superior Court is advised that the information is insufficient, and to sustain the demurrer.

In this opinion SEYMOUR, TORRANCE and FENN., Js., concurred.

State ex rel. Morris *v.* Bulkeley.

CARPENTER, J.   I agree that the demurrer should be sustained and mainly for the reasons expressed in the foregoing opinion.   But I cannot concur in all the views expressed on other matters; especially those relating to the power of the General Assembly to examine the returns and declare the result after the second day of the session.   Neither do I wish to be understood as wholly dissenting.   I think it wiser to say nothing, as the court is not called upon to express any opinion on that subject for several reasons:— 1st.  The case lays no foundation for it.   The record does not present that question.—2d.  It has not been discussed by counsel on either side.—3d.  The question relates to the constitutional power of the General Assembly in a matter within its jurisdiction.   As a co-ordinate branch of the government it has the power and it is its privilege to determine that question for itself, subject possibly to the power of the court to declare the legislative action void, if it clearly violates the constitution and does injustice.—4th.  If at any time the legislature should ask our advice, then the question will properly arise.

I did hope that the court would consider more fully, and decide, whether the legislature has the *right* to consider the statutory returns in determining the result of the election, as that is in the case, was fully discussed, and could not have been regarded as *obiter*.   Moreover that is the rock on which the legislature split.

Another important question might, and I think should, have been considered.   That is this:—Should or should not the returns as they stand, inasmuch as the legislature has not corrected or changed them, (assuming that it has the power to do so,) be regarded as final and conclusive, and as indicating the legal result of the election?

I am aware that the opinion intimates, perhaps was intended to decide, that the Superior Court would have the power to determine for itself the result.   I am not prepared to concur in that view.   As I remember, that question was not argued.   I should prefer to hear it fully argued before deciding it.

If the question as to the conclusive character of the returns had been decided in one way, perhaps the court might have retained jurisdiction and have disposed of the case. But I think on the whole that it is well to let the legislature have another opportunity to settle the matter.